803 So.2d 171 (2001)
STATE of Louisiana
v.
Randy J. RICHTHOFEN.
No. 01-KA-500.
Court of Appeal of Louisiana, Fifth Circuit.
November 27, 2001.
*175 Jane L. Beebe, Gretna, LA, Attorney For Appellant Randy J. Richthofen.
Randy Richthofen, Angola, LA, Defendant In Proper Person.
Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Alison WallisCounsel of Record on Appeal, Assistant District Attorneys, Gretna, LA, Attorneys for Appellee State of Louisiana.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS and CLARENCE E. McMANUS.
CANNELLA, Judge.
The Defendant, Randy J. Richthofen, appeals from his conviction of second degree murder and his sentence to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. For the reasons which follow, we affirm.
On February 18, 1999, the Defendant was charged by grand jury indictment with second degree murder of a female juvenile, a violation of La. R.S. 14:30.1. The Defendant was arraigned on March 1, 1999 and pled not guilty. On March 14, 15, 16, and 17, 2000, the case was tried before a twelve-person jury. The jury unanimously found the Defendant guilty as charged.
At trial, the following testimony and evidence was presented. On August 18, 1998, Brenda Boudreaux (Brenda) died as a result of injuries to her head. Becky Boudreaux (Boudreaux), Brenda's mother, testified for the State that she was 13 or 14 years old when she first met the Defendant, who was a friend of her mother. In October of 1997, Boudreaux and the Defendant started dating. They moved-in together at the end of January of 1998 and resided at 719 Avenue B in Westwego. Becky was seventeen years old at the time. Brenda, born on April 28, 1997, also lived with them.[1] The Defendant's daughter, Brittany Richthofen, (Brittany) who was six-years-old at the time, started living with them about the second week of February, *176 1998 and was living with them at the time Brenda became ill.
Boudreaux testified that on April 2, 1998, her father, Louis Boudreaux, was in West Jefferson Hospital (West Jefferson). Boudreaux left home about 6:30 p.m. to go visit her father. She left Brenda in the Defendant's care while she was at the hospital. Brittany was also at home with the Defendant on that day. Boudreaux stated that she left the hospital at about 8:30 p.m. to go back home. When she got back home, Brenda was asleep.
The next morning, Boudreaux got up and got Brittany dressed to go to school. When Boudreaux tried to wake up Brenda, she kept closing her eyes and would not wake up. Brenda was listless, weak and not alert. Boudreaux testified that usually Brenda woke up laughing and would "get into stuff," move around and would want to eat breakfast. Boudreaux dropped Brittany off at school and brought Brenda to the emergency room at West Jefferson. Boudreaux assumed Brenda was dehydrated because the week before, she had been vomiting and also had diarrhea. Boudreaux stayed at the hospital with Brenda until 10:00 in the evening and then went home. About 4:30 or 5:00 in the morning, Boudreaux got a call from Dr. Gerald Ross in the pediatric intensive care unit who told her that Brenda had stopped responding and that he wasn't sure why. The Defendant dropped Boudreaux off at the hospital. She went and talked to Dr. Ross and then waited. Brenda went into a coma, and the doctors performed brain surgery. After the surgery, they put Brenda on a life support machine. She stayed in the hospital for a few days. They didn't expect her to live. Brenda started to breathe on her own about a week later. They took her off the ventilator and the following week, they sent her to Children's Hospital for rehabilitation. Brenda could not eat, so the doctors surgically inserted a feeding tube. She stayed at West Jefferson for about two weeks, and she stayed at Children's Hospital for about a month. Brenda eventually went home and physical therapists came to the house and worked with her. Boudreaux took Brenda to the doctors for follow-up appointments and she kept bringing her to the hospital because she was running a high fever. When the fever would go down, she would bring Brenda home. The doctors had to insert a shunt in Brenda's head to keep the fluid from building up on her brain. After Brenda came home, she couldn't do anything. She would lay down and cry or would do nothing and stare. She didn't move, laugh or smile and she would not respond if her name was called or to noise. Boudreaux identified photographs of Brenda taken before and after April 2, 1998, marked for identification as state's exhibits one through 11 and 21 through 27, respectively. Boudreaux testified that Brenda never returned to the way she was prior to the April 2nd incident.
Boudreaux stated that she saw the Defendant become angry with Brenda often, between five and ten times. She testified that Brenda's crying caused the Defendant to become angry. In response, the Defendant would take Brenda and put her in bed and put blankets around her where she couldn't see anything, and a few times he put blankets over her, and Boudreaux would go and remove them. When Brenda cried during the night, the Defendant would take her and put her in the playpen in a room in front of the house. Boudreaux stated that in the middle of March, every time the Defendant would enter into the room, or go near Brenda, she would stop doing whatever she was doing, stare for a second and cry.
*177 On one occasion, after Boudreaux had bathed Brittany, Boudreaux came out of the room and saw Brenda in the Defendant's arms. Brenda was not alert, so the Defendant put her in cold water and then Brenda started crying. Boudreaux stated that "it looked like he knew what he was doing." On that occasion, Brenda was in the same condition which she was in when Boudreaux brought her to the hospital in April of 1998. Boudreaux testified that Brenda was in that same condition on two other occasions. Boudreaux also testified that the Defendant had been physically violent with her on several occasions.
When the doctors told Boudreaux that Brenda had suffered Shaken Baby Syndrome, Boudreaux thought that the Defendant had done it. Boudreaux testified that nothing else had happened to Brenda while she was in her care that could have explained that kind of injury. Other than Boudreaux, no one else had primary responsibility for caring for Brenda. Brenda did not have any accidents or falls that would have caused that kind of injury. Boudreaux stated that she did not see any bruises or bumps or anything on Brenda which would have indicated that she had bumped her head or fallen. Boudreaux admitted that, during the course of the investigation into Brenda's injury, she was at times untruthful with the police because she was scared and didn't know what to say. Boudreaux testified that she was scared to talk to the detectives the first few times because the Defendant had told her to tell the police that she lived with her aunt and not him.
Dr. Ross, who was qualified as an expert witness in the field of pediatric intensive care, testified for the State that in April of 1998, Brenda was admitted to West Jefferson as someone who was dehydrated due to vomiting and diarrhea. When Brenda failed to respond to 24 hours of rehydration, Dr. Ross was consulted. Dr. Ross stated that when he first saw Brenda, she appeared somewhat dehydrated and listless, and had a decreased level of consciousness. She was not interactive and only responded to deep pain and other forceful stimuli. Dr. Ross performed a physical examination of Brenda, but he did not note any external signs of trauma.
Dr. Ross stated that her condition acutely, or suddenly, deteriorated. When he examined Brenda, he found a pupil that was dilated. Upon examination of her fundus, the back part of the eye, he found hemorrhages. Dr. Ross found her to be hypertensive and bretacartic, which meant a slow heart rate. Those findings indicated to him that there was a pathology inside the head. He found her to be hydrated adequately. Dr. Ross ordered a computerized axial tomography (CAT) scan which showed acute hemorrhage and subacute fluid that may have been old blood or a different collection of fluid. In his opinion, the acute hemorrhage occurred within 24 to 72 hours prior to her acute deterioration, and that the acute deterioration occurred a day or two after her admission. Dr. Ross testified that the subacute fluid occurred less than a week or two prior to her acute deterioration. Dr. Ross testified that he was not sure what caused the subacute fluid in this case, but that subacute blood was caused by Shaken Baby Syndrome. Dr. Ross indicated that retinal hemorrhaging could be caused by hypertension or eye problems, but that 99 percent of the time it was caused by Shaken Baby Syndrome.
Dr. Ross determined that Brenda had an intracranial bleed, a hemorrhage, and consulted Dr. John Steck, a neurosurgeon. They decided that Brenda needed to undergo surgery immediately. During surgery, Brenda had a cardiopulmonary arrest, which was similar to a heart attack. *178 They stabilized her condition, and she remained in ICU. Dr. Ross testified that he ruled out the diagnosis of dehydration and started to investigate whether Brenda had Shaken Baby Syndrome, which was one of the causes of acute intra ventricular intracranial bleeds. Dr. Ross explained that Shaken Baby Syndrome or blunt trauma could have caused the blood vessels to shear in the eyes and in the brain. He stated that Shaken Baby Syndrome occurred when a baby has been held and shaken in a back and forth type movement. Dr. Ross found no evidence of blunt trauma to Brenda. He testified that it would take "quite violent force" to shear blood vessels inside a child's brain or in her eyes. Dr. Ross stated that there was no doubt in his mind that Brenda suffered this type of injury causing event. He stated that Brenda was an at-risk child in that she had some congenital abnormalities which put her at risk for abuse. After Brenda's surgery, Dr. Ross consulted with Dr. Scott Benton who agreed that this was a Shaken Baby Syndrome case, after Dr. Scott had performed a physical examination of Brenda. He testified that he was aware that Brenda had been diagnosed with Adams Oliver Syndrome, but that would not have caused massive hemorrhaging like she had. He stated that although he was not 100 percent sure this was a Shaken Baby Syndrome case, he was 99.9 percent sure.
Dr. Steck, who was qualified as an expert in the field of neurosurgery, testified at trial for the State and corroborated Dr. Ross. When he saw during surgery that Brenda had an extremely elevated intracranial pressure, he was convinced that Brenda had Shaken Baby Syndrome because there was no external evidence of serious head trauma. The degree of pressure indicated to Dr. Steck that Brenda had suffered a severe brain injury. Dr. Steck testified that Brenda's Adams-Oliver Syndrome had nothing to do with the injury which she sustained. He also stated that there would be clear evidence of external trauma if her injury had been caused by an accidental fall and that there was "no way" that her condition was caused by a car accident. Dr. Steck explained that Shaken Baby Syndrome is caused by a repetitive flopping back of the head, and that because of a baby's weak neck muscles, the shaking causes a bruising of the brain.
Dr. Steck testified that he saw Brenda again in August of 1998 when he was consulted in the hospital for consideration that she may have hydrocephalus, which he explained was an accumulation of fluid within the brain. He stated that the hydrocephalus was a progression of the brain injury which Brenda suffered as a result of the Shaken Baby Syndrome diagnosed in April of 1998. Dr. Steck explained that the brain was actually dying, that the neurons were permanently injured and had died and that brain cells were being lost which caused the ventricles to increase in size. He performed a ventricular perineal shunt to allow the fluid to get out of the brain and to be absorbed by the body in another manner. After that, Dr. Steck saw Brenda again because her pediatrician noticed that she had a bulging fontanelle. A CAT scan indicated that the shunt which Dr. Steck had placed was not functioning properly and would need to be revised. However, when Brenda came in, she had a fever and an elevated white count, and they worried that she might have an underlying infection, so they treated her with antibiotics. Brenda came back again. Dr. Steck operated on Brenda again and took the shunt out and put in a temporary drain until they could determine that she had no infection. He stated that the operation went well. However, Brenda had a problem that night and died. Dr. Steck testified that the ultimate cause of Brenda's *179 death was Shaken Baby Syndrome which occurred within a couple of days before he initially saw her in early April of 1998.
Dr. Benton, who was qualified as an expert in the field of forensic pediatrics, testified for the State that he first saw Brenda on April 6, 1998 after receiving a referral from Lieutenant Joe Ellington of the Westwego police department. Dr. Benton got permission from Dr. Ross to see Brenda, and Dr. Ross indicated to him that she was a critical patient, meaning that she could die at any moment. Dr. Benton performed a physical examination of Brenda and consulted with a geneticist about Adams-Oliver Syndrome which is an extremely rare condition. Dr. Benton explained that as a result of this syndrome, Brenda had a scalp defect, abnormalities and missing parts of the limbs, amniotic bands and heart defects. He stated that persons with Adams Oliver Syndrome have normal intelligence and normal brain function. Dr. Benton reviewed the diagnostic tests done and the literature regarding Adams-Oliver Syndrome and diagnosed Brenda with Shaken Infant Impact Syndrome, also called Shaken Baby Syndrome, or possibly a variant called Tin Ear Syndrome.
Dr. Benton explained Shaken Infant Impact Syndrome to the jury using graphics and diagrams, State's exhibits 28 through 54. He stated that nothing else could have caused Brenda's condition. Dr. Benton testified that she had bruising around one ear which indicated blunt trauma to the ear. He said that he hadn't seen that finding noted by any of the other doctors. Dr. Benton stated that the injury to the ear, the subdural hematomas, retinal hemorrhages, and the brain injury all fit Tin Ear Syndrome. He stated that he sees this syndrome in children who have been hit across the head, which impacts the ear and spins the head around with enough force that the child gets all the same findings as Shaken Infant Syndrome. Dr. Benton said that in making the diagnosis of Shaken Baby Syndrome, the history needed to be devoid of any significant accidental trauma, and that in Brenda's case, he was not presented with any history to account for the severity of the injuries which he saw. Dr. Benton stated with absolute certainty that the trauma which Brenda suffered pre-existed her admission to the hospital. He testified that he didn't know whether the injury to her ear went together with the rest of her brain findings or if it was an isolated incident where someone accidentally bumped her ear during the course of her hospitalization.
Dr. Benton's opinion that Brenda suffered angular acceleration injury was based on the fact that she had cerebral edema, a comatose state, blood in a space in her head where it didn't belong, and a bruise to the ear. Even if the bruise to the ear occurred after admission, all of the remaining findings still indicated to Dr. Benton that she suffered Shaken Baby Syndrome. Dr. Benton stated that subdural hematomas like Brenda's can only occur as a result of high velocity injuries, such as side impact car accidents, falls from multi-story buildings, or other situations involving significant trauma. He testified that subdural hematomas don't occur by accidentally hitting the head on the gurney cart or by a nurse accidentally hitting the ear.
Dr. Susan Garcia, who was qualified as an expert in the area of forensic pathology, testified for the State that she performed an autopsy on Brenda on August 19, 1998. Dr. Garcia stated that Brenda's brain weighed less than it should have for an infant of her size and that she had sustained some type of injury to her brain matter which caused it to shrink. There was fluid where tissue should have been. *180 Dr. Garcia found certain inflammatory changes in her spinal cord and in the dura, the covering of the brain, that indicated she had some bleeding event prior to that time. Dr. Garcia stated that it was old bleeding and that she couldn't tell when it happened.
Dr. Garcia obtained Brenda's medical records from Children's Hospital. Based on a review of the records and the autopsy, Dr. Garcia opined that Brenda had sustained a traumatic brain injury immediately prior to her presentation at Children's Hospital three months prior to death. Dr. Garcia testified that, because of the lack of certain changes and the time span, she was unable to say with 100 percent accuracy that it was Shaken Baby Syndrome, but that would be her primary diagnosis on a differential list of possible mechanisms. Dr. Garcia stated that Brenda's traumatic brain injury was not a natural disease process and therefore it was a homicide because she could not have inflicted it herself. She testified that she would not have expected to see this type of injury in a child that fell and bumped her head, or in a child that rolled around on the floor and bumped her head on a coffee table, or in a child who was picked up and placed back down quickly.
Brittany was called as a witness by the State.[2] Brittany, age eight, testified that she lived with the Defendant, Boudreaux and Brenda before she started living with her grandparents. Brittany stated that the Defendant once had to babysit her and Brenda while Boudreaux was visiting her father at the hospital. Brittany and Brenda stayed in the room and played Sega while Boudreaux was gone. The Defendant was watching television in his room, but came into the other room twice to change Brenda's diaper. Brittany testified that the Defendant never picked up Brenda while Boudreaux was at the hospital, and that she never told anyone that she saw the Defendant pick up Brenda while Boudreaux was at the hospital. The State then impeached Brittany by showing a videotape to the jury.[3]
Brittany said that before the interview on the videotape, her mother said, "say that your daddy shook the baby or I'm going to woop your butt." Brittany testified that she remembered telling the woman that he didn't shake the baby. She stated that she had told the prosecutor previously that she saw her father shake the baby. However, she testified that she only said that because her mother was in the room and told her that if she didn't say that, she was going to give her dog food for dinner. Brittany stated that she lived with her grandparents and that since she had been living there, her father had called and talked to her "way more than ten times." She testified that she had spoken *181 to her father two nights prior. Brittany stated that when her father took her to her mother's house after Brenda had to go to the hospital in April, she heard her father tell her mother, "whatever happens just take care of my daughter." Brittany testified that no one ever babysat her and Brenda other than the Defendant.
Jessica Avila (Avila), Brittany's mother, was called as a witness by the State. She testified that prior to the April incident, Brittany stayed with her father (the Defendant) during the week and on weekends she would stay with Avila. Avila testified that the Defendant dropped off Brittany unexpectedly one afternoon at the end of March or the beginning of April 1998, and that he told her, "whatever happens, take care of my daughter." The Defendant explained to Avila that Brenda was sick and had to go to the hospital. The State impeached Brittany through Avila's testimony. Without objection by the Defendant, Avila testified that when she spoke to Brittany that night about what happened to Brenda, Brittany told her that the night before Brenda had to go to the hospital, Brenda had started crying, and her father shook her, put her on the bed and she went to sleep. Avila stated that Brittany demonstrated to her how her father had shaken Brenda that night.
The Defendant called Avila the day after he dropped off Brittany and identified himself by his nickname, "Lip." The Defendant asked Avila to call Johnny Johnson (Johnson). The Defendant told her he had put his jewelry in the trunk of his car and he wanted to let Johnson know where the keys were "in case anything happened." He said that his car was in the hospital parking garage. The Defendant told Avila that he was about to be taken in for questioning about Brenda. Avila placed the three-way call to Johnson. She listened for a moment and then hung up. Avila testified that she took her daughter to be interviewed at several different places. However, she said that she never told Brenda what to say, nor did she threaten her in any way. Brittany told Avila after that night that her father had been "mean" to Brenda. Avila testified that Brittany did not want to come to court and testify because she was "scared that she was going to send her daddy to jail." Avila also said that she never fed her daughter dog food. Avila testified that the relationship between her and the Defendant did not work-out because it was violent. She said that while she was in a relationship with the Defendant, she was sometimes afraid of him.
Pattie Gros Harris (Harris), who was called as a witness by the State, was qualified as an expert in the field of physical therapy. She testified that she had worked with Brenda from age six or eight weeks to 10 or 11 months. She testified that Boudreaux took very good care of Brenda. Harris said that at the end of March or in April of 1998, Brenda's performance deteriorated a great deal and she was very lethargic, unable to participate and cried the whole time. Boudreaux told Harris that Brenda had been having a stomach virus and was dehydrated. Harris never saw Brenda again after the end of March until her funeral. Harris testified that during the time she saw Brenda, she was going through developmental milestones, achieving goals Harris set, progressing well and was Harris'"star patient."
Donna Stall was qualified as an expert in the field of early childhood development and testified for the State. She testified that she would have expected Brenda to have developed and lived a normal life despite her congenital problems because all of her problems were physical. Stall stated that she continued to see Brenda *182 once or twice a week until her death. It was Stall's impression that Boudreaux was a "remarkable" caregiver for Brenda and that she was actively involved in trying to help her develop. Stall stated that in late February or early March, Brenda had a virus, so she didn't see her for a few weeks. When Stall went to see her again, Brenda did not respond to Stall like she normally did. Brenda cried the whole time and there was nothing Stall could do to console her. Stall testified that at that time, Brenda was "scared to death" of her. She stated that she had never seen Brenda cry before. Stall explained that it was a "strange" kind of behavior, and that it was not a cry like she was afraid, but it was a "moaning, whining, just a sick cry." When she saw Brenda after she got out of the hospital, she could not do what she did before. She could not track movement, she was drooling "like a stroke victim," she didn't smile or laugh, she couldn't hold her head up, and she made no sound other than a low moaning. Stall testified that, if Brenda had lived, she had no chance of having a normal life after her hospitalization.
Johnson, who was called as a witness by the State, testified that he was a good friend of the Defendant and had known him for two years. Johnson stated that he received an unusual telephone call from the Defendant at the end of March or the beginning of April of 1998. Johnson thought that the Defendant was calling from West Jefferson. The Defendant told Johnson to go get his car out of the parking lot at West Jefferson and bring it to his mother, which he did. Johnson testified that the Defendant told him that his jewelry was in the trunk of the car. Johnson stated that he looked in the trunk of the car and found the jewelry and that there was nothing in the trunk other than the jewelry, tools and a jack.
Cynthia Casbon, who was called by the defense, testified that she was friends with the Defendant and had known him for nine years. She stated that she had been romantically involved with him at one time, was currently married and living in Georgia, but had maintained constant contact with the Defendant. Casbon testified that she helped the Defendant take care of Brittany right after she was born. Casbon stated that in June or July of 1998, she came to New Orleans for a visit. During that visit, Brittany told Casbon that her mother had said that if she did not tell the detectives that her father had shaken the baby, that her mother would whip her. Casbon testified that she had a second conversation with Brittany and that Brittany had told her that her father did not shake the baby. Casbon stated that she last talked to the Defendant in August of 1998, that she had tried to locate him when she was in town in June or July of 1998, but couldn't.
Casbon testified that she called Johnson's house in May or June of 1998 and that Johnson told her the whereabouts of the Defendant. In June or July of 1998, when she came into town for a visit, Casbon spoke to the Defendant's parents. Casbon testified that Brittany was with the Defendant's parents when Casbon spoke to them. After Brittany told Casbon that her mother wanted her to lie, Casbon told the Defendant's parents. Casbon said that Brittany never gave her a reason why her mother wanted her to lie. Casbon testified that Avila caused problems while she (Casbon) was dating the Defendant, and that Avila told the Defendant that if he continued to see Casbon, he would not be able to see his daughter, so Casbon "backed out of the picture." Casbon stated that she did not like Avila, but that she had no ill feelings towards her. She said that she had never spoken with the police about the information Brittany *183 gave her. She stated that she "believed" she told the Defendant that Brittany told her that her mother had asked her to lie about his involvement in the case.
The Defendant did not testify. There was evidence admitted that he had been involved in physical violence to another juvenile who had lived with him at an earlier time.
After trial, the Defendant filed a motion for new trial which was denied on March 27, 2000. On that same day, the Defendant waived sentencing delays and was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. It is from this conviction and sentence that the Defendant now appeals.
Defense counsel has filed a brief with five assignments of error and the Defendant has filed a pro se brief assigning five errors. Where the arguments overlap, they will be considered together.
The Defendant has raised issues on appeal regarding sufficiency of the evidence, improper closing argument, erroneous admission of evidence and an erroneous denial of a challenge for cause. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Mayeux, 94-105 (La.App. 5th Cir.6/28/94), 639 So.2d 828, 834. If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds that the totality of the evidence was sufficient to support the defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the trial court's error requires a reversal of the conviction or was harmless. State v. Alexis, 98-1145 (La.App. 5th Cir.6/1/99), 738 So.2d 57, 64, writ denied, 99-1937 (La.10/13/00), 770 So.2d 339. Therefore, we will first consider the assigned errors concerning the sufficiency of the evidence.

COUNSELED ASSIGNMENT OF ERROR NUMBER ONE

PRO SE ASSIGNMENT OF ERROR NUMBER ONE
By these assignments of error, the Defendant argues in both the counseled brief and his pro se brief that the evidence was insufficient to support his conviction for second degree murder, because the State failed to prove, beyond a reasonable doubt, that he shook Brenda and caused her death.
In reviewing the sufficiency of the evidence, due process requires the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. The actual trier of fact is presumed to have acted rationally until it appears otherwise. State v. Mussall, 523 So.2d 1305 (La.1988).
*184 In the instant case, the Defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1, which provides in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.
In order to convict the Defendant of second degree murder pursuant to La. R.S. 14:30.1(A)(1), the state must prove (1) the killing and (2) specific intent to kill or to inflict great bodily harm. State v. Williams, 97-1135 (La.App. 5th Cir.5/27/98), 714 So.2d 258, 263.
Specific criminal intent is "that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The determination of specific criminal intent is a question of fact. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Lewis, 97-160 (La.App. 5th Cir.7/29/97), 698 So.2d 456, 459, writ denied, 97-2381 (La.3/27/98), 716 So.2d 881. Specific intent may be inferred from the circumstances and the actions of the defendant. Seals, 684 So.2d at 373; Lewis, 698 So.2d at 459.
In order to convict the Defendant of second degree murder pursuant to La. R.S. 14:30.1(A)(2)(b), the State must prove that the death of Brenda occurred while the Defendant was engaged in the perpetration of cruelty to juveniles.
Cruelty to juveniles is set forth in La. R.S. 14:93(A) and it provides that cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect of a child whereby unjustifiable pain or suffering is caused to the child. The term "intentional" within the meaning of this statute, requires general criminal intent to cause a child unjustifiable pain and suffering. State v. Cortez, 96-859 (La. App. 3rd Cir.12/18/96), 687 So.2d 515, 519, citing State v. Morrison, 582 So.2d 295 (La.App. 1st Cir.1991). Mistreatment as used in this statute means "abuse." State v. Cortez, 687 So.2d at 519, citing State v. Comeaux, 319 So.2d 897, 899 (La.1975).
Thus, in order for the State to prove that the Defendant was guilty of second degree murder pursuant to La. R.S. 14:30.1(A)or (2)(b), it had to establish either (1) that the Defendant intentionally mistreated or neglected the child, or (2) that the Defendant was criminally negligent in his mistreatment or neglect of the child. To be criminally negligent in his mistreatment or neglect of the child, the defendant must have such disregard for the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. State v. Porter, 99-1722 (La.App. 3rd Cir.5/3/00), 761 So.2d 115, 123; see La. R.S. 14:12.
In a case involving circumstantial evidence, La. R.S. 15:438 provides that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Captville, 448 So.2d 676, 678 (La.1984); State v. Wooten, 99-181 (La.App. 5th Cir.6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty *185 beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
In the instant case, the Defendant argues that the evidence was insufficient to convict him of second degree murder. Specifically, he contends that there was no direct evidence to convict him of the crime and that the only direct evidence was recanted by Brittany on the stand at trial. The Defendant claims that Brittany said on the videotape that he had shaken Brenda only because her mother, Avila, had threatened to beat her and feed her dog food. The Defendant argues that when Brittany was out of harm's way at trial, she was able to tell the truth that the Defendant had not shaken Brenda. The Defendant claims that Avila was not telling the truth when she testified that Brittany told her on the night which Brenda went into the hospital that her father had shaken her and that she was sick. The Defendant claims that this story is unbelievable in that Brittany would not have known what was wrong with Brenda before the doctors did.
The Defendant also claims that Boudreaux was being less than truthful when she testified that Brenda only cried when the Defendant came into the room, since Stall testified that Brenda cried a fearful cry every time she saw her during the last two visits. The Defendant notes that the testimony showed that Brenda was lethargic and sick during the last two weeks of March, and that she didn't suddenly get sick the day after the Defendant stayed home alone with her. The Defendant argues that Boudreaux's testimony was inconsistent. He states that Boudreaux testified that Brenda always cried when he was around. However, Boudreaux testified that she left Brenda alone with the Defendant while bathing Brittany and did not hear crying or fussing. The Defendant, in his brief by counsel, claims that all reasonable hypotheses of innocence were not excluded at trial and that the State failed to prove that the Defendant harmed Brenda in any way. The Defendant, in his pro se brief, also argues that the State failed to exclude every reasonable hypothesis of innocence and, therefore, his conviction should be vacated.
A review of the record indicates that the evidence was sufficient under the Jackson standard to convict the Defendant of second degree murder. Boudreaux testified that she left Brenda in the Defendant's care to go to the hospital and that the next morning Brenda didn't wake up as usual. Drs. Ross, Steck and Benton all agreed that Brenda had Shaken Baby Syndrome. Dr. Ross said the injury occurred 24 to 72 hours prior to her acute deterioration, and that the acute deterioration occurred a day or two after her admission. Drs. Steck and Benton confirmed the time frame. Dr. Benton testified that the act of shaking a child is a violent one and that it would have taken "quite violent or considerable force" to shear the blood vessels in Brenda's brain and eyes. The doctors also testified that there was subacute fluid which had probably occurred less than a week or two prior to her acute deterioration. Dr. Garcia testified that Brenda's death was a homicide and that Shaken Baby Syndrome was her primary diagnosis on a list of possible mechanisms. The testimony of Boudreaux, Stall and Gros indicate that Brenda was a normal, functioning baby before the injury and a listless, lethargic baby after the injury. The doctors testified that her Adams Oliver Syndrome did not cause the brain injury which led to her death.
Although there was no direct evidence that the Defendant shook Brenda and caused her death, it is reasonable to infer *186 that he committed the crime. The testimony indicates that the Defendant was alone with Brenda during the pertinent time frame and had the opportunity to shake her. On the night before Brenda was taken to the hospital, the Defendant, Boudreaux, and Brittany were at home with Brenda. The testimony from Stall and Gros was that Boudreaux was a good mother, took excellent care of Brenda, always participated in her numerous physical therapy sessions and always kept her appointments with the therapists. There was no testimony at trial that Boudreaux was a bad mother or that she had ever mistreated Brenda. Based on the testimony at trial, the jury could have found that Boudreaux was not responsible for her child's death. Dr. Benton testified that the youngest perpetrator on record of shaking a baby was thirteen years of age, and that it would have taken considerable force to cause Brenda's injuries. Therefore, the jury could have found that Brittany, who was six years old at the time of the incident, was too young to have committed this crime. Brittany testified that no one ever babysat her and Brenda other than the Defendant. Therefore, there was ample evidence presented to support the jury's conclusion that the Defendant was the person who shook Brenda.
Additional evidence also supported the verdict. The Defendant and Boudreaux moved in together in late January of 1998 and lived together in February and March of 1998. According to Boudreaux, the Defendant had been working two jobs when they moved in together, but had quit one of the jobs in March, "a couple of weeks before everything started happening." The testimony showed that the Defendant behaved in unusual ways. Boudreaux testified that the Defendant would take the baby at night and put her in the front room. She stated that she saw the Defendant become angry with Brenda often, between five and ten times, and in response, he would put her in bed and put blankets around her or on top of her. Boudreaux stated that on one occasion, after Boudreaux had bathed Brittany and had come out of the room, she saw Brenda in the Defendant's arms. She was not alert, so the Defendant put her in cold water and then Brenda started crying. Boudreaux testified that, "it looked like he knew what he was doing." Boudreaux testified that in the middle of March, every time the Defendant would enter the room, or go near Brenda, she would stop whatever she was doing, stare for a second and cry. She stated that Brenda never acted that way when she or anyone else was caring for her. Boudreaux also testified that Brenda never had problems while they lived with her family after Brenda's birth or with Boudreaux's aunt through January of 1998.
The evidence indicates that the Defendant had violent propensities. Boudreaux testified that on one occasion, the Defendant punched her, choked her, pulled her hair, beat her up and she blacked out. Boudreaux testified that she tried to leave the Defendant once, but he took something from her car so that it wouldn't start. She stated that she didn't call the police because the Defendant had threatened her and she was scared. Avila, the Defendant's previous girlfriend and Brittany's mother, testified that the relationship between her and the Defendant failed because it was violent, and that she was sometimes afraid of him. The State introduced evidence which showed that the Defendant and his former wife, Tracy Allo, pled guilty under Alford to the crime of simple battery for injuries sustained by Allo's daughter, a juvenile. Based on the foregoing, evidence was presented to the jury to show that the Defendant was a violent person and that he used violent force to inflict the injury upon Brenda.
*187 There was also evidence tending to show that the Defendant had a guilty conscience or that he was aware he was responsible for Brenda's injuries. On the day Boudreaux took Brenda to the hospital, the Defendant dropped Brittany at Avila's house and told Avila, "take care of my daughter no matter what happens." When the Defendant went to the hospital, he called his friend, Johnson, and told him to get his car with his jewelry in the trunk and take it to his mother's house. He did all of this before being questioned by the police and when the doctors still thought that Brenda was dehydrated. Boudreaux received a call from Dr. Ross at 4:30 a.m. or 5:00 a.m. the day after Brenda was admitted, and Dr. Ross told her that she was not responding and he wasn't sure why. The Defendant, who was engaged to be married to Boudreaux, did not accompany her to the hospital, but instead just dropped her off. Boudreaux testified that the Defendant told her to lie to the police and tell them that she lived with her aunt and not him. Based on all of the above, the jury could have concluded that the Defendant had a guilty conscience, because he knew what he had done to Brenda and what he probably had been doing to her in the past.
Finally, Brittany testified that the Defendant never shook Brenda. However, she was impeached with a videotape which showed that she had told a woman that the Defendant had shaken Brenda. The State also impeached Brittany through the testimony of her mother, Avila, who testified that Brittany had told her that the Defendant shook Brenda.
The Defendant, in his pro se brief, contends, inter alia, that Brenda's Adams-Oliver Syndrome, combined with incorrect medical diagnoses, resulted in her illness and eventual death. He claims that the ear bruise was caused by a virus which probably invaded the brain, eventually causing her death. The Defendant argues that he was a loving father figure to Brenda, and that he worked two jobs to support her and Boudreaux. As the State argues, there is nothing in the record to support any of these contentions. As was stated previously, the doctors testified that Brenda's Adams Oliver Syndrome had nothing to do with the injury that killed her. No evidence was introduced to prove that any of the medical diagnoses in this case were incorrect. There was no evidence introduced to show that the ear bruise was caused by a virus.
Based on our review of the law and the entire record, we find that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime of second degree murder had been proven beyond a reasonable doubt. Jackson, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; State v. Captville, 448 So.2d 676 (La.1984). These assignments of error lack merit.

COUNSELED ASSIGNMENT OF ERROR NUMBER TWO

PRO SE ASSIGNMENT OF ERROR NUMBER TWO
By these assignments of error, the Defendant's counsel argues that the trial court erred by allowing the State to use multiple photographs of Brenda prior to her injury. He contends that, although the photographs were not gruesome, they were cumulative, highly prejudicial, and had no probative value. The Defendant claims that the excessive number of photographs were introduced simply to pander to the jury's emotions and not to prove the case. He argues that Brenda's ability to sit, hold a bottle, and behave as an eleven month old was not contested. The Defendant contends that the prosecutor not only *188 introduced 24 photographs showing a happy baby, they also had two experts testify as to her therapy, mood and ability to function prior to the injury. He states that any argument that the photographs show that the brain injury was unrelated to her Adams Oliver Syndrome is also faulty because four medical doctors were allowed to testify and clarify that the syndrome did not explain the injury. The Defendant, in his pro se brief, argues that photograph number six, and the photograph that showed Brenda with a red ear, inflamed the jury and were inadmissible. He also argues that photograph number six did not show the Defendant holding Brenda as Boudreaux testified, but instead showed Defendant's image in a mirror. The Defendant contends that the photograph inflamed the jury, prejudiced him, was inadmissible, and used illegally in violation of his fundamental fair trial rights.
With some exceptions, all relevant evidence is admissible at trial. La. C.E. art. 402. Relevant evidence is that which tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. art. 401. The determination concerning relevancy of evidence is within the discretion of the trial judge whose rulings will not be disturbed in the absence of an abuse of discretion. State v. Winfrey, 97-427 (La.App. 5th Cir.10/28/97), 703 So.2d 63, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481.
Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted, are generally admissible, provided that their probative value outweighs any prejudicial effect. State v. Jackson, 00-1014 (La.App. 5th Cir.12/13/00), 778 So.2d 23, 31, citing State v. Glynn, 94-0332 (La.App. 1st Cir.4/7/95), 653 So.2d 1288, writ denied, 95-1153 (La.10/6/95), 661 So.2d 464. Photographic evidence is properly admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict a defendant without sufficient evidence. Moreover, the cumulative nature of photographic evidence does not render it inadmissible if it corroborates the testimony of witnesses on essential matters. State v. Lane, 414 So.2d 1223 (La.1982); State v. Miles, 402 So.2d 644 (La.1981).
Before allowing photographs of Brenda at trial, the trial judge looked at some of the photographs which the State wanted to present and excluded those which were not relevant or which were cumulative. The trial judge ruled that the photographs admitted into evidence were relevant and showed different aspects of the child's life. Although many of the photographs admitted into evidence were taken in the same time frame, the trial judge found that was acceptable considering that the child "only survived on this earth for eleven months." A review of the record indicates that 17 photographs, State's exhibits one through 11, were taken prior to Brenda's April 1998 injury, and seven photographs, State's exhibits 21 through 27, were taken after the injury. Of the approximately 50 photographs sought to be introduced into evidence, 24 were actually admitted into evidence.
A review of the photographs reveals that they are relevant and admissible, and their probative value is not substantially outweighed by the danger of unfair prejudice. The photographs of Brenda before the injury demonstrate varying levels of interaction with people, and the ability to express emotions, stand, sit and hold things, and none of the photographs appear to be cumulative in the sense of describing those various events. The photographs taken after the injury show Brenda sitting and *189 laying down with a sad expression on her face. The photographs corroborate the testimony of several witnesses, including Boudreaux, her mother, Harris, her physical therapist, and Stall, her early interventionist, and support the fact that Brenda was an active, happy baby before the injury and a listless, lethargic baby after the injury. The photographs also corroborate the testimony of Drs. Ross and Steck and support the testimony that, at the hospital after the injury, Brenda was unresponsive and not interactive, and that Adams Oliver Syndrome did not cause her brain injury. Based on the foregoing, we find that the trial court did not err in admitting the photographs into evidence.
The Defendant, in his pro se brief, argues more specifically that photograph number six and the photograph that showed Brenda with a red ear, inflamed the jury, were inadmissible, and prejudiced him. He argues that photograph number six was not introduced to show the Defendant holding Brenda as Boudreaux testified, but instead it was introduced to show the Defendant's image in a mirror. The Defendant contends that the photographs were inadmissible and used illegally in violation of his fundamental fair trial rights.
The Defendant did not lodge contemporaneous objections on these grounds during trial as required by La.C.Cr.P. art. 841 and, therefore, is precluded from raising these issues on appeal. State v. Styles, 96-897 (La.App. 5th Cir.3/25/97), 692 So.2d 1222, 1227-1228, writ denied, 97-1069 (La.10/13/97), 703 So.2d 609. The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem and to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. Id.
However, even if we were to consider the Defendant's pro se assignment, we find no error in the admission of the photographs. First, there is some confusion as to which photographs the Defendant finds objectionable. While he refers only to photograph number six, he describes the picture of Brenda's injured ear and a picture of himself reflected in a mirror. Photograph number six is not of Brenda's ear or of a discernable view of the Defendant reflected in the mirror. The picture barely shows dark hair and a part of an arm in a mirror, but it does not show anyone's face and it is impossible to tell who the person is. The fact that an image was captured in the mirror does not render the photograph inflammatory or prejudicial. Rather, it is simply one of the photographs of Brenda prior to the injury. Second, if we consider the photographs of Brenda's bruised ear, we find that the photographs were relevant to show her condition in the hospital after her injury. They were not gruesome, nor do we find that the probative value was substantially outweighed by the prejudicial effect. Thus, we find that the photographs corroborate Boudreaux's testimony and were relevant to show Brenda's condition prior to and following her injury. These assignments of error lack merit.

COUNSELED ASSIGNMENT OF ERROR NUMBER THREE
By this assignment of error, defense counsel argues that the trial judge erred in denying his challenge for cause during voir dire of prospective juror, Norma Baumann (Baumann). He claims that Baumann should have been excused for cause because her voir dire responses indicated that she could not be a fair and impartial juror in any homicide case in which a child was the victim. The Defendant also contends that Baumann, under pressure by *190 the trial judge to give the "correct" response, changed her answer regarding being able to objectively consider the evidence in a case involving a child, to give the response that the trial court was seeking.
La.C.Cr.P. art. 797 provides, in pertinent part, as follows:
The state or the defendant may challenge a juror for cause on the ground that:
* * * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
* * * *
(4) The juror will not accept the law as given to him by the court;
A challenge for cause should be granted, even when a prospective juror declares her ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. State v. Allen, 95-1754 (La.9/5/96), 682 So.2d 713; State v. Bailey, 97-302 (La.App. 5th Cir.4/28/98), 713 So.2d 588, writ denied, 98-1458 (La.10/30/98), 723 So.2d 971. The trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror, and such determinations will not be disturbed on appeal unless a review of the voir dire as a whole indicates an abuse of that discretion. State v. Lee, 93-2810 (La.5/23/94), 637 So.2d 102; State v. Alberto, 95-540 (La. App. 5th Cir.11/28/95), 665 So.2d 614, writ denied, 95-1677 (La.3/22/96), 669 So.2d 1222, writ denied, 96-0041 (La.3/29/96), 670 So.2d 1237.
To prove error warranting reversal of both the conviction and sentence, a defendant need only show that he exhausted all of his peremptory challenges and that the trial judge erroneously denied a challenge for cause. State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810.
In this case, the record shows that the Defendant used all twelve of his peremptory challenges. Thus, the issue is whether the trial judge's refusal to remove the juror at issue was an abuse of discretion.
The Defendant contends that Baumann gave responses in voir dire that indicate that she could not be a fair and impartial juror in a homicide case in which a child was the victim.[4]
Following questioning of Baumann by defense counsel, the prosecutor and the trial judge, the trial judge refused to excuse Baumann for cause because "she said that she could be fair and impartial and after listening to the evidence, the testimony and instructions of law, reach a fair and impartial verdict based solely on the evidence, the testimony and the law." Defense counsel used a peremptory challenge to strike Baumann.
Based on our review of the entire voir dire, we find that the responses of Baumann, as a whole, indicated that she could *191 have been a fair and impartial juror. When the prosecutor asked Baumann if she would be able to put her emotions aside and make a "cold, unbiased opinion," she responded in the affirmative. Further, when the trial judge asked Baumann if she would require the State to prove the elements of the crime beyond a reasonable doubt, she answered, "yes." Although some of Baumann's responses during voir dire could be viewed as questionable, standing alone and out of context, we find that the totality of her responses reveals that she would have been a fair and impartial juror and the trial judge did not err in refusing the defense challenge for cause. This assignment or error lacks merit.

COUNSELED ASSIGNMENT OF ERROR NUMBER FOUR
By this assignment of error, defense counsel argues that in the State's rebuttal closing argument, the prosecutor became emotional and cried, which prejudiced the Defendant and caused the jury to identify with the prosecutor and in an effort to comfort him, side with his version of the case. The Defendant contends that the trial court should have either admonished the jury pursuant to La.C.Cr.P. art. 771 after the display of emotion or granted a mistrial.
Because Defendant failed to lodge a contemporaneous objection on this ground during trial as required by La.C.Cr.P. art. 841[5], he is precluded from raising this issue on appeal. State v. Styles, 96-897 (La.App. 5th Cir.3/25/97), 692 So.2d 1222, 1227-1228, writ denied, 97-1069 (La.10/13/97), 703 So.2d 609. The purpose of the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem and prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. Id.
Even though the Defendant did not lodge a contemporaneous objection, he raised this issue in the trial court in his motion for a new trial which was denied. The trial judge's reasons for denial of the motion provide this Court with a clearer understanding of what occurred during this case:
With regard to the emotion during the close, it was a very emotional case. There's no doubt about that. Anytime a case involves the death of an eleven year old [sic] baby, emotions are invoked. There were a number of times during the trial that were very emotional and the Court did note that jurors became emotional at certain times of the trial. With regard specifically to Mr. Bates' closing argument and the fact that at the end of his closing argument he cried, the Court does not feel that there was any attempt on Mr. Bates to purposely express that emotion. It was something that he was overcome with at the close of his argument. Before Mr. Bates got to that point in his argument, as a matter of fact, there were a number of jurors who had broken down into tears. I would mention for the record that immediately after Mr. Bates' closing argument the Court took a recess in order to allow everyone to regain their composure and to calm down. And this break was a break that lasted for some period of time, went back to counsel and we again reviewed the jury instructions and the verdict form. The jury instructions were read to jury after this break. And *192 after both the jurors and everyone else who was participating in the trial had an opportunity to become calm and regain any composure that may have been lost during closing arguments, I'd also mention that during the Court's instruction to the jury that the Court did instruct the jury that their verdict must be based upon the facts and the evidence in this case. And that they should apply the instruction of the juryexcuse me, instruction of the Court in reaching their verdict by applying those instruction to the facts and the evidence, that their verdict would not be based on prejudice, passion, sympathy, or public opinion. With all of that said, the Court does hereby deny the motion for new trial.
No reported cases could be found where a prosecutor cried during closing argument. However, in State v. Domangue, 350 So.2d 599 (La.1977), the Louisiana Supreme Court deemed a mistrial unnecessary when a rape victim's spouse began crying during closing arguments and before being escorted outside. Similarly, in State v. Hopkins, 626 So.2d 820 (La.App. 2 Cir.1993), the victim's family appeared upset and cried during closing arguments. The trial judge denied a mistrial and did not immediately admonish the jury. She did later charge them not to be influenced by sympathy, passions, prejudice, or public opinion.
In the instant case, the trial judge took a lengthy recess to allow everyone to regain their composure and he instructed the jury not to base their verdict on prejudice, passion, sympathy or public opinion. A mistrial was not requested at the time of the occurrence. Even if we view this assignment of error as a complaint regarding the trial court's denial of a new trial, we find no reversible error presented by this argument. This assignment of error lacks merit.

PRO SE ASSIGNMENT OF ERROR NUMBER THREE
By this assignment of error the Defendant in his pro se brief argues that the failure of the indictment to cite all essential elements of the crime resulted in an invalid and/or defective indictment and, therefore, the conviction must be reversed.
The time for testing the sufficiency of an indictment is before trial by a motion to quash or an application for a bill of particulars. State v. Gainey, 376 So.2d 1240, 1243 (La.1979). Although counsel failed to file a motion to quash, he claims that he filed a bill of particulars and did, in fact, argue the motion prior to trial.[6] Therefore, his claim will be considered on appeal.
An attack on the sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth an identifiable offense. State v. Taylor, 781 So.2d at 1218 citing State v. Williams, 480 So.2d 721, 722 (La.1985). The test to determine the sufficiency of a bill is whether it is misleading to the defendant. State v. Gaines, 97-672 (La.App. 5th Cir.2/25/98), 707 So.2d 1354, 1358, writs denied, 98-1039 (La.9/18/98), 724 So.2d 749, citing State v. Bouie, 598 So.2d 610, 612 (La.App. 4th Cir.1992).
Article I, § 13 of the Louisiana Constitution requires that an indictment inform a defendant of the nature and cause of the accusation against him.
La.C.Cr.P. art. 464 provides:
The indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall state for each *193 count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
La.C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including second degree murder. The constitutionality of the short forms has been consistently upheld by the Louisiana Supreme Court. State v. Taylor, 781 So.2d at 1218 citing State v. Baylis, 388 So.2d 713, 718-719 (La.1980) and State v. Liner, 373 So.2d 121, 122 (La.1979). When those forms are used, it is intended that a defendant may procure details as to the statutory method by which he committed the offense through a bill of particulars. State v. Taylor, 781 So.2d at 1218 (citations omitted).
On February 18, 1999, the State charged the Defendant by grand jury indictment which read in pertinent part, "Randy J. Richthofen ... on or about the 2nd day of April ... 1998 with force and arms, in the Parish of Jefferson ... violated La. R.S. 14:30.1 in that he did commit second degree murder of a female juvenile." Accordingly, the Defendant was charged in compliance with La.C.Cr.P. art. 465(A)(32), which provides a short form indictment for second degree murder: "A.B. committed second degree murder of C.D."
On July 15, 1999, defense counsel orally argued a motion for bill of particulars, requesting that the State inform her of the particular section of the statute with which the Defendant was charged. The State informed the Defendant that he was charged with La. R.S. 14:30.1(A)(2)(b). At the end of the lengthy discussion, defense counsel stated, "Okay. Your Honor, that's all I have foras far as clearing up the answers to my motion for bill of particulars."
After a thorough review of the record, we find that the Defendant was sufficiently informed of the charge against him in the indictment and was not prejudiced by any defect in it at trial.
The Defendant cites United States v. Cabrera-Teran, 168 F.3d 141 (5th Cir. 1999) to support his argument. In Cabrera-Teran, defendant was convicted of illegal reentry into the United States, a violation of 8 U.S.C.S. § 1326. On appeal, he contended that the indictment failed to properly charge an offense. The appellate court vacated the judgment of conviction and remanded, finding that the indictment was fatally defective in that it failed to charge that defendant had been arrested pursuant to the language of 8 U.S.C.S. § 1326. The court found that a charge of arrest, as an element of the offense contemplated under § 1326 was required, even though the indictment cited the correct statute, and that statutory citations could not stand in the place of the inclusion of an element of the crime.
We find that Cabrera-Teran is distinguishable from the instant case. In Cabrera-Teran, the indictment was inadequate because a charge of arrest, an essential element of the offense, was not cited in the indictment, whereas in the instant case, the indictment was adequate because the State charged the Defendant by using a short form indictment for second degree murder which was authorized by La. C.Cr.P. art. 465. Therefore, Cabrera-Teran is inapplicable to the instant matter. We find no error in the form of the indictment used in this case. This assignment of error lacks merit.

*194 PRO SE ASSIGNMENT OF ERROR NUMBER FOUR

PRO SE ASSIGNMENT OF ERROR NUMBER FIVE
By these assignments of error the Defendant argues that his second degree murder conviction should be reversed on the ground of discriminatory selection of the grand jury. He alleges a violation of the equal protection and due process clauses based upon the systematic exclusion of blacks from the position of grand jury forepersons. The Defendant also contends that the former system for selecting grand jury forepersons pursuant to La.C.Cr.P. art. 413(B) encouraged race-based decision-making by judges and was, therefore, unconstitutional.
Any objections arising from the selection of the grand jury foreperson are treated as ones alleging discriminatory selection of grand jurors. Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998). All equal protection claims arising out of the selection or composition of grand juries in Louisiana remain subject to this State's procedural requirements. Any equal protection claim that is not asserted in a pre-trial motion to quash is waived. La.C.Cr.P. arts. 533(1) and 535(D); State v. Pierre, 99-3156 (La.App. 4th Cir.7/25/01), 792 So.2d 899, 907; State v. Robinson, 32 794 (La.App. 2nd Cir.3/1/00), 754 So.2d 311, 321-322, writ denied, 00-989 (La.3/23/01), 787 So.2d 1008; State ex rel. Roper v. Cain, 99-2173 (La.App. 1st Cir.10/26/99), 763 So.2d 1, 4-5, writ dismissed, 00-975 (La.11/17/00), 773 So.2d 733; Deloch v. Whitley, 96-1901 (La.11/22/96), 684 So.2d 349. The record in the instant case is void of a pre-trial motion to quash the indictment filed on behalf of the Defendant. Since the Defendant did not preserve this objection by filing such a motion, the objection is waived and may not be considered on appeal.
In State v. Langley, 95-1489 (La.6/19/98), 711 So.2d 651, 675 (on rehearing), the Louisiana Supreme Court (citing Campbell v. Louisiana) remanded a case for an evidentiary hearing on the defendant's allegation that the foreperson of the grand jury was selected in an intentionally discriminatory manner. In doing so, the court indicated the issue had been "properly raised before trial." In the instant case, unlike the defendants in Campbell and Langley, the Defendant did not preserve the issue for review.
Moreover, even if we considered the issue under Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 1424, 140 L.Ed.2d 551 (1998), Defendant's argument fails because he did not carry his burden of proof of establishing a prima facie case of purposeful discrimination. This assignment of error lacks merit.

PATENT ERROR REVIEW
Defendant requests, pursuant to La. C.Cr.P. art. 920, a review of the record for any error discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.
The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990). The review reveals no errors patent on the record in this case.
Accordingly, for the foregoing reasons, the conviction of the Defendant of second degree murder and his sentence to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence is affirmed.
AFFIRMED.
NOTES
[1] Brenda was born with physical disabilities, diagnosed as Adams Oliver Syndrome. Brenda's left eye was not fully developed and, therefore, she had an artificial eye from which she could not see. Brenda's arms were not fully developed either; the left arm stopped at the elbow, and there were only three fingers on her right hand. Boudreaux stated that Brenda's brain and "everything else" was normal.
[2] At first, Brittany refused to come into court and testify, so a hearing was held where she ultimately decided she would testify and the trial judge decided that she was competent to testify.
[3] The videotape, State's exhibit 57, shows a woman questioning Brittany about Brenda. Brittany tells the woman that Brenda was very sick and vomited a lot, "a million times." She stated that on one occasion, she was peeking through the door to the kitchen and saw her father shake Brenda, which Brittany demonstrated with a doll. Brittany said that her father then took Brenda's clothes off and put her in cold water, and then put Brenda's clothes back on. Brittany said that Boudreaux was in the kitchen with her father and told him to stop shaking the baby. Brittany stated that she went to her bedroom. Her father came into the bedroom and asked what she was doing, and Brittany said she was looking for something with which to play. Brittany said that her father locked her in her bedroom. She stated that she only saw her father shake Brenda that one time.
[4] A review of the discussion at the bench among the trial judge, the prosecutor and defense counsel indicates that the court reporter apparently made a mistake when transcribing the testimony. A review of the transcript indicates that Baumann's comments were attributed to Darla Laudumiey by the court reporter. We have reviewed those responses in considering this issue.
[5] La.C.Cr.P. art. 841 provides in pertinent part:

A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.
[6] A copy of the bill of particulars is not found in the record.