STATE OF LOUISIANA

VERSUS

PEDRO A. MONTERROSO

NO. 22-KA-390

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 14-3761, DIVISION "H"
HONORABLE DONALD L. FORET, JUDGE PRESIDING


April 26, 2023


**JOHN J. MOLAISON, JR.**
**JUDGE**


Panel composed of Judges Susan M. Chehardy,
Robert A. Chaisson, and John J. Molaison, Jr.


**CONVICTION AND SENTENCE AFFIRMED;**
**MATTER REMANDED**
   **JJM**
   **SMC**
   **RAC**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
PEDRO A. MONTERROSO
    Holli A. Herrle-Castillo

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Darren A. Allemand
    Kellie M. Rish
    Zachary P. Popovich

**MOLAISON, J.**

The defendant/appellant, Pedro A. Monterroso, appeals his conviction of second-degree murder. For the reasons that follow, we affirm his conviction and sentence.

## PROCEDURAL HISTORY

On October 30, 2014, a Jefferson Parish Grand Jury returned an indictment charging defendant, Pedro A. Monterroso,[1] with one count of second degree murder of Heidy Monroy in violation of La. R.S. 14:30.1. The defendant pled not guilty at his arraignment on November 3, 2014. During the protracted pre-trial period, numerous motions, responses, and memoranda were filed. The only motion pertinent to this appeal is the November 26, 2018 Notice of Intent to Introduce Evidence of Other Acts filed by the State. Following a hearing held on February 8, 2019, the trial judge ruled that evidence of prior acts of sexual and physical abuse were admissible.

On March 21, 2022, a twelve-person jury was selected. On March 24, 2022, after closing arguments, the defense counsel moved for a mistrial, which the judge denied. Thereafter, the jury unanimously found the defendant guilty as charged. The defendant's motion for new trial was denied. On May 4, 2022, the defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. This timely appeal followed.

## FACTS

On July 13, 2014, numerous officers from the Jefferson Parish Sheriff's Office responded to 4004 Durand Street, apartment four, in response to a call for service. The only furnishings in the one bedroom/one-bathroom apartment were an air mattress and one chest of drawers. The bathroom was located through a

---

[1] The indictment lists the following names defendant is also known as: Pedro Monterroso Navas, Pedro Alberto Monterroso Navas, Wilson Rigoberto Varela Mena, Marlin Jovani Varela Mena, Carlos Humberto Cisneros Avila, and Alberto Cisnceros.

door off of the bedroom. The victim, Heidy Monroy, who was in the tub in the bathroom, was pronounced deceased at the scene.

The two children at the scene spoke Spanish. Deputy Abraham Andino requested the assistance of a second officer so that he could separate the brothers to interview them separately. Deputy Andino testified that the older boy stated that his younger brother told him that his father, later identified as the defendant, killed his mother. Sergeant Michael Rios, who interviewed the five-year-old brother, testified that the child stated that he saw his father hit his mother with a stick in the bathroom. Detectives learned that the defendant had left and taken three other children with him. This prompted the sheriff's office to initiate an AMBER alert with the Louisiana State Police for the other three children: J.M., Y.M., and B.M.

Crime scene photographs were taken. Pursuant to a search warrant, a small piece of rebar without tape on it was found in the bathroom closet along with an orange knife. A black knife was found on the kitchen counter. Various paperwork with the children's names was also collected.

Deputy Melvin Francis reviewed the photographs taken outside and inside the apartment with the jury. The deceased victim was photographed lying in the tub before she was removed by the coroner's office. She was photographed again on the bedroom floor. The victim had a "massive injury to the back of her head," injuries to her left hand, and a large incision on her right hand.

Captain Dennis Thornton stated that they procured a phone number in the initial part of the investigation that they believed was connected to the defendant, but it was determined that the phone number actually belonged to Hassan Zakaria, who had a relationship with Heidy. On the night of Heidy's death, Mr. Zakaria was working at Brother's Food Mart from 9:00 p.m. to 9:00 a.m.[2] Based on text

---

[2] Mr. Zakaria testified that he met Heidy when she would come into the store; they exchanged phone numbers and eventually had sex. Heidy went to his house on two occasions, a week before her death and at 7:00 p.m. the day she died. On the date of Heidy's death, Mr. Zakaria was at work from around 8:30 p.m. until 9 a.m. the next morning. Mr. Zakaria testified that Heidy came to the store twice that evening,

messages between Mr. Zakaria and the defendant,[3] the police located a new possible phone number associated with the defendant, but that new phone number led nowhere.

Captain Thornton testified that he received a call from a 9-1-1 supervisor indicating that one of the missing children, B.M., had called an individual in Metairie. It was determined that the call came from a phone number associated with Fredy Alarcon[4] in Katy, Texas. Captain Thornton then notified law enforcement in Harris County that there was an investigation regarding the defendant being a murder suspect and that they were looking for the children. The defendant was apprehended by the Harrison County Sheriff's Office. The three children were placed in protective custody.

Sergeant Rhonda Goff testified that she served as the lead investigator in this case. At the scene she learned that two children were left at the residence; based on what those children told other officers, she obtained an arrest warrant for the defendant. Sergeant Goff was informed that the defendant was detained in Katy, Texas, and that Nelin Monroy, the victim's sister, was detained in El Paso, Texas.

Sergeant Goff and Detective Julio Alvarado traveled to Texas to speak to Nelin and the defendant. The defendant consented to giving a buccal swab sample

---

between eleven and twelve, with Hispanic people. Mr. Zakaria described her as having consumed alcohol but not being drunk.

[3] On the night of Heidy's death, Mr. Zakaria received a text from an unknown number from someone "pretending that he is her boyfriend or her husband." That person told Mr. Zakaria that he was not interested in Heidy, that he was interested in his children, and that Heidy did drugs. Mr. Zakaria denied ever seeing her do drugs.

[4] Mr. Alarcon testified that he lives in Katy, Texas, and is a pastor. He met the defendant prior to July of 2014 in Guatemala and only saw him once after that in Katy. The defendant called Mr. Alarcon before he went to Texas because he thought his wife was having an affair. Mr. Alarcon advised defendant to separate from her and find another place to live. Sometime after that conversation, the defendant called Mr. Alarcon again and said he was coming to visit and was close to his church with his children. Mr. Alarcon went to the church where a lady dropped off the defendant and three children. The smallest child wore only a diaper, and one child did not have on shoes. Mr. Alarcon bought the children shoes and fed them, and took the defendant to a church service. During the service, the defendant "bent his knees and cried." After the service, Mr. Alarcon took the defendant and the children to his house where they stayed the night. Mr. Alarcon testified that the defendant told him that he separated from his wife because they could not live together and that he beat her once. The police arrived at Mr. Alarcon's house around two in the morning and arrested the defendant.

for DNA testing. Sergeant Goff did not observe any injuries to the defendant except an old injury on the defendant's hand.

As a result of the information developed in the investigation, a second search warrant was obtained and executed on July 16, 2014. A second piece of rebar, which was wrapped with duct tape, was located in the bathroom closet.

Mr. Timothy Scanlan,[5] who was accepted as an expert in the fields of crime scene reconstruction and blood stain analysis, testified that he examined the primary bloodstain patterns that were located in the bathroom of the apartment. There was blood on the floor and diluted blood stain patterns along the rear edge of the tub and rear wall. Mr. Scanlan opined that the blood stain patterns were consistent with the victim being struck with a hard object, like a piece of rebar, with her head positioned as the police found it. There was also blood consistent with a smear, as if someone braced against the wall. Mr. Scanlan testified that the blood stain patterns indicated that the victim received more than one blow and that the scene was not consistent with a slip and fall. Rather, the scene was consistent with the bathroom being the sole area of attack where the victim received "blood-letting injuries." Those injuries were received while the victim was at or near the edge of the tub.

David Cox, of the Jefferson Parish Sheriff's Office, was accepted as an expert in forensic DNA analysis. Mr. Cox analyzed the DNA collected in this case and authored a report. He testified that he analyzed two pieces of rebar – one a piece of rebar that was not covered and a second piece of rebar that was covered in duct tape. DNA testing of the un-taped rebar revealed that one end was positive for blood. One side of that rebar contained Heidy's DNA, while the other end contained a mixture of at least three DNA profiles. Both Heidy and the defendant were excluded as the major contributor of that DNA mixture. Mr. Cox also tested

---

[5] At the time, Mr. Scanlan was employed by the Jefferson Parish Sheriff's Office.

both ends of the rebar that was wrapped in duct tape. One end had multiple hairs attached to it. One side of that rebar contained DNA that was consistent with the defendant, and the other side contained DNA consistent with Heidy.

Dr. Susan Garcia, who was accepted as an expert in forensic pathology, testified that she conducted an autopsy on Heidy on July 14, 2014. Dr. Garcia testified that the cause of death was blunt force trauma to the back of the head with bleeding at the base of the brain and ruled the death a homicide. Dr. Garcia pointed to the U-shaped injury to the back of Heidy's scalp that was consistent with being struck in that area by a hard object. This injury was not consistent with a fall. The doctor explained that her death was not instantaneous but that she likely lost consciousness quickly. A neuropathology report confirmed that the bleeding at the base of the brain was caused by the blunt force trauma rather than a natural cause.

Dr. Garcia also observed the following: an incised wound behind the left ear caused by a sharp instrument consistent with a knife inflicted from behind, incised wounds on the left and right thumbs, and blunt force trauma to both hands including a fracture or break to the left fourth finger. Dr. Garcia testified that the injuries to the head and hands were defensive-type wounds. A toxicology report revealed that the victim had an elevated level of alcohol in her system and that there were no commonly abused drugs in her system.

Nelin Monroy testified that she knows defendant, Pedro A. Monterroso, as Wilson Rigoberto Mena. She met him in Honduras, where they began a relationship. Nelin and the defendant ultimately had four children[6] together: B.M., C.M., M.M.M. and Y.M.

---

[6] When Nelin was pregnant, she was confronted by a woman looking for the defendant. This woman claimed to be the defendant's wife. Nelin later found the defendant's diplomas and a marriage certificate that showed that the defendant went by another name.

Nelin testified that during her relationship with the defendant, he was physically violent towards her, elaborating: "[h]e busted my mouth and he hit me with his legs in my back side." He also grabbed her by the hair. On one occasion, the defendant pointed a gun at her head and told her that it was not worth it for him to shoot her because a bullet was more valuable than her life.

When Heidy was fifteen years old, Nelin discovered that Heidy was pregnant with the defendant's child. Heidy and defendant ultimately had three children together: M.C.M., M.M., and J.M. At some point, Nelin, the defendant, and Heidy moved to Guatemala. They first lived separately, but then Heidy and her children moved in with Nelin, the defendant and their children. When Nelin stated that she did not like this arrangement, the defendant "did a few shots towards" Nelin's feet. During that time, Nelin witnessed physical violence by the defendant to Heidy and the children. One time, the defendant hit Heidy in the head with the butt of a pistol. Nelin saw the defendant tape the children's mouths, hands, and feet, and hang them by their legs. Nelin tried to leave the relationship and went to Honduras. Nelin testified that the defendant told people that if he found her, he would murder her.

Nelin and three of her children moved to her parents' house in December of 2013. In March of 2014, the defendant found her in Honduras, where he "grabbed her by the neck and hair" before his brother intervened. Nelin later left her children with her mother in Guatemala and fled to Mexico. She tried to cross the border into the United States on May 27, 2014, but she was detained by immigration in El Paso, Texas. While she was detained, she learned that Heidy was killed.

M.C.M., who was fifteen at the time of trial, identified the defendant and Heidy as his parents. M.C.M. saw his father hit his mother when they lived in Honduras, elaborating that the defendant threatened her with a gun and hit her with a gun on a daily basis. M.C.M. testified that when Heidy was pregnant with J.M.,

the defendant pointed a gun at her stomach and threatened to shoot her if she tried to leave.

In 2014, M.C.M. came to Louisiana with Heidy, J.M., M.V.M., and B.M. They lived in an apartment in Metairie, and the defendant later moved into the apartment. M.C.M. testified that on July 13, 2014, he was sleeping when he heard his mother come in. He recalled, "[T]hey was [sic] arguing, starting to get a little touchy, starting like approaching each other, and so they went to the bathroom." His father accused his mother of cheating. M.C.M. pretended to be asleep, and his father became violent. Heidy struggled to get away, and his father grabbed her hands.

M.C.M. further testified that he could see into the bathroom because the door was slightly open. M.C.M. saw defendant try to push Heidy to the floor. As she struggled, defendant became really violent and started hitting her. The defendant then pushed Heidy, and she fell into the tub. As the defendant was hitting her, M.C.M. saw his mother's hands stop moving. The defendant continued to hit Heidy. At some point, M.C.M. saw the defendant try to cover up something. M.C.M. testified that the defendant then went to the kitchen and threw something in the garbage. Then the defendant took something outside, and then came back in.

M.C.M. fell back asleep and was later woken up by his brother, M.V.M., who was crying and said their mother was not moving in the bathtub. M.C.M. testified that he and M.V.M. went into the bathroom and "saw her and the blood." At that time, the defendant, Y.M., J.M., and B.M. were gone. Only M.C.M. and M.V.M. remained in the apartment. The brothers knocked on a neighbor's door, and the neighbor called the police.[7] When police arrived, the brothers told them what happened.

---

[7] Ernesto Orochena lived at an apartment at 4004 Durand Street in July of 2014. Mr. Orochena testified that in the early morning of July 13, 2014, Mr. Orochena was awakened by children screaming for help. He opened his door and saw two children, whom he described as "scared," and they told him what was going on. He explained that he and the children spoke Spanish. Mr. Orochena called 9-1-1 and relayed what the children told him.

M.V.M.,[8] who was 13 years old at the time of trial, identified his parents as the defendant and Heidy. M.V.M. testified that on multiple occasions, when his family lived in Honduras, the defendant would tie his and his brother's feet and hang them upside down. M.V.M., his mother, and his siblings moved to Louisiana, and the defendant later moved in with them. M.V.M. testified that a few days before Heidy was killed, the defendant gave him and M.C.M. each a dollar in exchange for them telling him whether Heidy was seeing another man. M.V.M. told him that she was, and the defendant appeared "mad and upset and disappointed."

M.V.M. testified that on July 13, 2014, the defendant cut Heidy's hand with a knife while they were in the kitchen, then Heidy went into the bathroom to shower when the defendant began screaming at her. They began to argue, and the defendant got physically violent as they went into the bathroom where the door was partially open. M.V.M. explained that the defendant threw items in the bathroom, like bars of soap, at Heidy. M.V.M. heard things breaking and his mother screaming. M.V.M. testified that once the fighting in the bathroom stopped, the defendant left the bathroom. The defendant then grabbed "things" from the room and left the apartment with B.M., J.M., and Y.M. M.V.M. testified that he went into the bathroom and saw his mother lying in the tub with the water running. Her head and hands were bleeding, and M.V.M. shook her to try to wake her up. M.V.M. woke up his brother, and they went to a neighbor who called the police.

B.M. testified that she was the daughter of the defendant and Nelin. She recalled that when her family lived in Guatemala, her father hit her brothers. The defendant also "grabbed them and like wrapped them with chains and like just

---

[8] M.V.M. was also identified as M.M.G. in the record.

pulled them like up, up their head, and like just grabbed them like that." B.M. testified that the defendant once beat Nelin with a plastic tube.

B.M. testified that she came to Louisiana with the defendant and Y.M. On July 12 into July 13 of 2014,[9] Heidy was hanging out with a new friend, the neighbor,[10] and drinking. The defendant joined her, and later B.M.'s brothers went to visit the neighbors. When it got late, her brothers returned to the apartment to sleep. B.M. explained that Heidy was very drunk and wanted to go somewhere with the neighbor, but the defendant told her "no." B.M. went to sleep, and her father later returned carrying Heidy by her arms because she was too drunk to walk. The defendant took Heidy into the bathroom and summoned B.M. to the bathroom to help remove Heidy's clothes so the defendant could give her a shower. During this time, two-year-old J.M. approached Heidy and was trying "to like grab her and hug her." Heidy pushed him away. After assisting in removing Heidy's clothes, B.M. left the bathroom. The bathroom door was closed behind her. B.M. testified that she laid with J.M. and faked being asleep when she heard "a bang off a tube, like a metal tube." She explained that in the bathroom closet, there was "metal pieces of tube."

When she heard the noise, B.M. got up to put her ear against the bathroom door and heard what sounded like her aunt running out of breath. B.M. went back to bed where she again pretended to be asleep. Her father came out of the bathroom without a shirt on. B.M. testified that she saw Heidy's bloody hand. The defendant told her they had to "go," and to wake up Y.M. Then the defendant, B.M., Y.M., and J.M. were picked up in a parking lot and driven to the house of a pastor in Texas. That night while they slept, the police arrived.

---

[9] B.M. explained that earlier in the day, Heidy and the defendant fought about another man.

[10] It is unclear from the testimony if B.M. was referring to one or more neighbors.

Y.M., who was twelve years old at the time of trial and is the son of the defendant and Nelin, testified that when he lived with the defendant in Guatemala, the defendant would get angry with him and he would chain Y.M.'s legs, turn him upside down, and leave him. He elaborated that the defendant almost never hit B.M. or the girls but that he "hit mostly everybody else." Y.M. moved to Louisiana with his aunt Heidy, the defendant, M.C.M., M.V.M., J.M., and B.M. One night he woke up to get some water and he saw his father in the bathroom where he raised his hands and screamed at Heidy. Y.M. got water and went back to sleep.

Brittney Bergeron Millet, a forensic interviewer at the Jefferson Children's Advocacy Center, testified that she conducted recorded interviews[11] with B.M.,[12] M.V.M.,[13] and M.C.M.,[14] on July 15, 2014. The videos of these interviews were played for the jury.

---

[11] Y.M. did not give an interview.

[12] In her interview, B.M. stated that Heidy was drinking at the neighbor's apartment and that she saw videos of her dancing in front of men there. Later, Heidy was very drunk. The defendant and Heidy argued in the kitchen about a phone. Heidy wanted to keep drinking, but the neighbors were already asleep. Heidy and the defendant began fighting, and Heidy told him that it hurt. B.M. pretended to be asleep. The defendant wanted to bathe Heidy and removed her clothes. B.M. heard a sound like a tube being taken out. B.M. indicated that there were a lot of metal tubes stored in the bathroom closet. When B.M. did not hear any noise, she got up and leaned against the door to listen. She could not hear voices but heard a sound like someone could not breathe. B.M. returned to the bed, and the defendant left the bathroom. B.M. saw Heidy lying in the bathtub with her bleeding hand extended. The defendant told B.M. they were leaving and to take her five-year-old brother and the baby. A car picked them up away from the apartment and took them to the bus station. They took a bus to Houston where they were picked up by a pastor.
  At trial, B.M. acknowledged that in the interview, she stated that they took a bus to Texas because the defendant told her to say that. She elaborated that she stated in the interview that she saw a video of her aunt dancing inappropriately at the neighbor's apartment because the defendant told her to say this. The defendant also told B.M. to say that Heidy attacked him first, but B.M. explained that Heidy was too drunk to do that.

[13] In the interview, M.V.M stated that he saw his mother kick his father in the foot. He further stated that the defendant hurt her head and finger with a knife from the kitchen. M.V.M. stated that he saw them in the bathroom, and the defendant later left.

[14] In his forensic interview, M.C.M stated that he heard "hitting sounds" in the apartment. He saw his father throw his mother in the bathtub and hit her. The defendant pushed her, and she hit the wall. M.C.M. stated there was a lot of blood in the bathtub. His father then stabbed her over the bathtub, but M.C.M. could not see where she was stabbed. M.C.M. saw the defendant with a large, bloody knife in his hand. The defendant threw the knife away. M.C.M stated that his mother had blood on the back of her head. The defendant left her in the bathtub and his brother saw the bathtub full of blood. They knocked on a friend's door, where they were told to call 9-1-1, and then the police came.

Dr. Ellie Wetsman was accepted as an expert in general pediatrics and child abuse pediatrics. Dr. Wetsman examined all of the children, noting that they had lice and many cavities. Dr. Wetsman testified that M.V.M. acknowledged that someone hit him and that he saw his siblings get hurt. The doctor testified that a looped mark from blunt trauma caused by Heidy was found on B.M. Y.M. provided that someone hit him. M.C.M. told Dr. Wetsman that his father hit him in the stomach and face. M.C.M. indicated that he "witnessed his father hit the little two-year-old in the finger." Based on her examination of the children, Dr. Wetsman diagnosed all of the children with "child physical abuse."

## ASSIGNMENT OF ERROR NUMBER THREE

The evidence was insufficient to uphold the conviction.

## LAW AND DISCUSSION[15]

In this assignment of error, the defendant challenges the sufficiency of the evidence, arguing that the evidence proved manslaughter, not second degree murder. Defendant alleges that "the murder was committed in heat of blood." He concludes that the conviction must be reversed or reduced to manslaughter.

The State counters that sudden passion or heat of blood is not an element of manslaughter but rather a mitigatory factor that may reduce the grade of the offense. It argues that the jury found that the defendant did not meet the burden of proving manslaughter. The State contends that the defendant knew about Heidy's adultery days prior to the murder, pointing out that he did not catch her in the act.

---

[15] When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992). The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. *Id.* When addressing the sufficiency of the evidence, consideration must be given to the entirety of the evidence, including inadmissible evidence which was erroneously admitted, to determine whether the evidence is sufficient to support the conviction. *See Id.* at 734. *See also State v. Griffin*, 14-251 (La. App. 5 Cir. 3/11/15), 169 So.3d 473, 483.

The constitutional standard for sufficiency of the evidence is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find that the State proved all of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Chinchilla*, 20-60 (La. App. 5 Cir. 12/23/20), 307 So.3d 1189, 1195, *writ denied*, 21-274 (La. 4/27/21), 314 So.3d 838, *cert. denied*, -- U.S. --, 142 S.Ct. 296, 211 L.Ed.2d 138 (2021). This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702.

This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *State v. Hayman*, 20-323 (La. App. 5 Cir. 4/28/21), 347 So.3d 1030, 1040. Further, a reviewing court errs by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804. As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt, but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *State v. Ordonez*, 16-619 (La. App. 5 Cir. 3/15/17), 215 So.3d 473, 477.

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Lloyd*, 21-645 (La. App. 5 Cir. 8/24/22), 348 So.3d 222, 231, *writ denied*, 22-1354

(La. 11/22/22), 350 So.3d 499. Where circumstantial evidence forms the basis of a conviction, the circumstances must be so clearly proven that they point not merely to the possibility or probability of guilt, but to the moral certainty of guilt. *State v. Nelson*, 14-252 (La. App. 5 Cir. 3/11/15), 169 So.3d 493, 501, *writ denied*, 15-685 (La. 2/26/16), 187 So.3d 468. The rule as to circumstantial evidence is "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Id.* (citing La. R.S. 15:438). This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. *State v. Manuel*, 20-172 (La. App. 5 Cir. 6/2/21), 325 So.3d 513, 539, *writ denied*, 21-926 (La. 10/12/21), 325 So.3d 1071.

The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Bartholomew*, 18-670 (La. App. 5 Cir. 10/23/19), 282 So.3d 374, 382, *writ not considered*, 19-1869 (La. 1/28/20), 288 So.3d 123. Absent internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Washington*, 16-732 (La. App. 5 Cir. 4/12/17), 219 So.3d 1221, 1226. It is not this Court's function to assess the witnesses' credibility or re-weigh the evidence. *State v. Lane*, 20-137 (La. App. 5 Cir. 12/23/20), 309 So.3d 886, 906, *writ denied*, 21-100 (La. 4/27/21), 314 So.3d 836.

In this case, the defendant was convicted of second degree murder, which is defined as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1. The defendant argues that he should have been convicted of manslaughter rather than second degree murder. The offense of manslaughter is defined as a homicide that would be first or second degree murder but the offense is committed in sudden passion or heat of blood

immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31; *State v. Ducksworth*, 17-35 (La. App. 5 Cir. 12/13/17), 234 So.3d 225, 231.

Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Instead, they are mitigating factors that may reduce the grade of the offense. *State v. Thompson*, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1266, *writ denied*, 18-2077 (La. 9/6/19), 278 So.3d 372. In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. *State v. Estes*, 14-781 (La. App. 5 Cir. 2/25/15), 168 So.3d 847, 857, *writ denied sub nom. State ex rel. Estes v. State*, 15-654 (La. 2/5/16), 186 So.3d 1164. The question for the appellate Court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *State v. Burse*, 19-381 (La. App. 5 Cir. 2/12/20), 289 So.3d 690, 696, *writ denied*, 20-650 (La. 11/24/20), 305 So.3d 104.

In the present case, the evidence presented at trial established that the intoxicated, naked victim was hit in the back of the head with a blunt object, which caused fatal bleeding at the base of her brain. The victim had several defensive wounds. Four of the children in the apartment at the time of Heidy's death testified that the defendant and Heidy were in the bathroom, that the defendant struck Heidy, and that when the defendant came out of the bathroom, Heidy was still inside of the bathroom.

The jury was presented with manslaughter as a responsive verdict but convicted defendant of second degree murder. The guilty verdict demonstrates that the jury found the State presented sufficient evidence of second degree murder. A review of the evidence supports the jury's finding.

The evidence indicates that the defendant knew of Heidy's infidelity at least several days prior to the murder. A few days before the murder, the defendant gave M.V.M. and M.C.M. each a dollar in exchange for them telling the defendant whether Heidy was seeing another man. M.V.M. testified that he told the defendant that she was. Additionally, the defendant called Mr. Alarcon before the murder and told him that "he thought his wife was having an affair." Further, the text messages exchanged between Mr. Zakaria and the defendant prior to the murder reflected that the defendant was aware of the affair. All evidence indicated that the murder was not immediately preceded by the defendant's discovery that Heidy had a relationship with another man.

The evidence presented at trial indicated that on the day of the offense, Heidy was drinking with the neighbor and did not want to go home. The testimony indicated that several of the children and the defendant were also at the neighbor's apartment. The defendant told B.M. to tell the police that she saw a video of Heidy dancing inappropriately at the neighbor's house. However, no evidence was presented that this occurred or that Heidy had an affair with the neighbor. Accordingly, the defendant failed to carry his burden of proof of "sudden passion" or "heat of blood."

In addition, B.M. testified that Heidy was too drunk to walk or to attack the defendant. The evidence presented indicated that Heidy and the defendant were arguing right before her death. Regardless of what they argued about, an argument does not reduce the offense to manslaughter. *See Burse*, 289 So.3d at 697 ("An argument alone does not constitute sufficient provocation to reduce murder to manslaughter.").[16]

---

[16] *See also State v. Berard*, 15-318 (La. App. 3 Cir. 10/7/15), 2015 WL 5837674 (unpublished opinion; not designated for publication), *writ denied*, 15-2066 (La. 11/29/16), 211 So.3d 388 ("While they were arguing and did have a rancorous relationship, arguments do not suffice to reduce a murder to manslaughter."); *State v. Lemons*, 38,269 (La. App. 2 Cir. 4/7/04), 870 So.2d 503, 508, *writ denied*, 04-1288 (La. 10/29/04), 885 So.2d 584 ("Moreover, our courts have not derogated from the principle that 'mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter.'").

Two pieces of rebar were found in the bathroom where Heidy was killed. Both pieces contained Heidy's DNA, and at least one piece contained the defendant's DNA. Heidy's cause of death was blunt force trauma to the back of the head with fatal bleeding at the base of the brain. The blood splatter pattern indicated that the victim was struck with a hard object, such as a piece of rebar. Heidy suffered from more than one blow and had defensive wounds. She also had injuries that were consistent with being inflicted with a knife. Although the two knives recovered from the apartment were not linked to these injuries, there was testimony that the defendant discarded something in the trash before fleeing to Texas.

Considering the evidence presented, including the testimony of the children who were present at the time of the murder, the defendant's actions, and the extent and severity of the victim's injuries, we find that the evidence was constitutionally sufficient to support the jury's finding that the defendant had the specific intent to kill or inflict great bodily harm on the victim. Hence, viewing the evidence in the light most favorable to the State, under the *Jackson* standard, a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support the conviction of second degree murder and that the defense did not establish the mitigatory factors of manslaughter. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER ONE

The trial court erred in admitting evidence of prior crimes.

## LAW AND DISCUSSION

The defendant argues that the trial court erred in admitting other crimes evidence regarding alleged abuse by the defendant and questions the credibility of the allegations. He further asserts that the allegations that he previously threatened to shoot Heidy or Nelin were not relevant because Heidy was not shot. The defendant avers that the alleged threats to shoot anyone were more prejudicial than

22-KA-390                                16

probative. He contends that the allegations involving hanging the children upside down by their feet did not happen in the United States and that practices of discipline accepted in the defendant's home country should not be used against him. The defendant concludes that the admission of the evidence was not harmless.[17]

The State contends that this evidence falls squarely under La. C.E. art. 412.4. The State argues that pursuant to Article 412.4, the actions need not be identical or even similar to the charged crime. The State asserts that there is no authority for the acts to be excluded because they occurred in another country where they might be acceptable. The State explains that in this instance, the admission of the other crimes evidence does not require an arrest, prosecution, or conviction. The State concludes that the evidence was properly admitted.

The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the accused committed the charged crime because the defendant has committed other such crimes in the past. *State v. Williams*, 09-48 (La. App. 5 Cir. 10/27/09), 28 So.3d 357, 363, *writ denied*, 09-2565 (La. 5/7/10), 34 So.3d 860. *See also* La. C.E. art. 404(B)(1). Evidence of other crimes, wrongs, or acts committed by the defendant is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." *State v. Prieur*, 277 So.2d 126, 128 (La. 1973).

However, while the State may not admit evidence of other crimes to prove that the defendant is a person of bad character, evidence of prior crimes may be admitted if the State establishes an independent relevance aside from proving the defendant's criminal character. *State v. Brown*, 17-348 (La. App. 5 Cir. 12/20/17), 235 So.3d 1314, 1323, *writ denied*, 18-158 (La. 11/5/18), 256 So.3d 276, *cert.*

---

[17] Nelin implied at trial that the defendant forced her to have intercourse. However, the defendant's focus on appeal is the abuse toward the children, the threats against Heidy and Nelin, and other physical abuse. As such, the defendant does not argue allegations of sexual abuse were improperly admitted.

*denied*, -- U.S. --, 139 S.Ct. 2033, 204 L.Ed.2d 233 (2019).  Evidence of other crimes, wrongs or acts is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct, formerly referred to as *res gestae*, that constitutes an integral part of the act or transaction that is the subject of the present proceeding.  *See* La. C.E. art. 404(B)(1); S*tate v. Joseph*, 16-349 (La. App. 5 Cir. 12/14/16), 208 So.3d 1036, 1046, *writ denied*, 17-77 (La. 4/7/17), 218 So.3d 109.

The State must provide the defendant with notice and a hearing before trial if it intends to offer other crimes evidence.  *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1037.[18]  Even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense.  *State v. Ard*, 20-221 (La. App. 5 Cir. 4/28/21), 347 So.3d 1046, 1055.

A statutory exception to the exclusionary rule can be found in La. C.E. art. 412.4, which states in part:[19]

> A. When an accused is charged with a crime involving abusive behavior against a family member, household member, or dating partner …, evidence of the accused's commission of another crime, wrong, or act involving assaultive behavior against a family member, household member, or dating partner …, may be admissible and may be considered for its bearing on any matter to which it is relevant, subject to the balancing test provided in Article 403.

> B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of

---

[18] La. C.Cr.P. art. 720 states:

> Upon written motion of defendant, the court shall order the district attorney to inform the defendant of the state's intent to offer evidence of the commission of any other crime admissible under the authority of Code of Evidence Articles 404 and 412.2. However, that order shall not require the district attorney to inform the defendant of the state's intent to offer evidence of offenses which relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding or other crimes for which the accused was previously convicted.

[19] La. C.E. art. 412.4 was enacted by 2016 La. Acts 399, § 1, and amended to encompass abusive behavior against dating partners by 2017 La. Acts 84, § 4, which amendment became effective on August 1, 2017. The article was amended again by Acts 2020, No. 101, § 3. *Ard*, 347 So.3d at 1056 n.8.  Prior to the enactment of this article, courts often upheld the admissibility of such evidence under La. C.E. art. 404(B). *State v. Thomas*, 19-582 (La. App. 5 Cir. 7/29/20), 300 So.3d 517, 527 n.5, *writ denied*, 20-1503 (La. 3/2/21), 311 So.3d 1053.  Thus, article 412.4 can be applied and does not constitute an *ex post facto* violation.  *See State v. Germany*, 21-1614 (La. App. 1 Cir. 9/26/22), 2022 WL 4477061, *writ denied*, 22-1568 (La. 1/11/23), 352 So.3d 983; *State v. Smith*, 17-661 (La. App. 4 Cir. 1/10/18), 237 So.3d 29, 44, *writ denied*, 18-273 (La. 2/18/19), 265 So.3d 771.

the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.

C. This Article shall not be construed to limit the admissibility or consideration of evidence under any other rule.

D. For purposes of this Article:

(1) "Abusive behavior" means any behavior of the offender involving the use or threatened use of force against the person or property of a family member, household member, or dating partner of the alleged offender.

(2) "Dating partner" means any person who is involved or has been involved in a sexual or intimate relationship with the offender characterized by the expectation of affectionate involvement independent of financial considerations, regardless of whether the person presently lives or formerly lived in the same residence with the offender. "Dating partner" shall not include a casual relationship or ordinary association between persons in a business or social context.

(3) "Family member" means spouses, former spouses, parents and children, stepparents, stepchildren, foster parents, foster children, other ascendants, and other descendants. "Family member" also means the other parent or foster parent of any child or foster child of the offender.

(4) "Household member" means any person presently or formerly living in the same residence with the offender and who is involved or has been involved in a sexual or intimate relationship with the offender, or any child presently or formerly living in the same residence with the offender, or any child of the offender regardless of where the child resides.

The admissibility of evidence under this article is not limited to those actions that are identical or similar in nature to the charged crime. *State v. Thomas*, 19-582 (La. App. 5 Cir. 7/29/20), 300 So.3d 517, 527, *writ denied*, 20-1503 (La. 3/2/21), 311 So.3d 1053. A plain reading of La. C.E. art. 412.4 broadly permits evidence of any prior domestic abuse against any family or household member to be admissible in connection with a separate criminal proceeding involving alleged domestic abuse of a different household member, subject to the balancing test provided in La. C.E. art. 403. *Jones v. State*, 22-269 (La. App. 5 Cir. 7/6/22), 346 So.3d 339, 341. Evidence of prior acts of domestic abuse is also admissible if

relevant and the probative value outweighs the prejudicial effect. *Gatson*, 334 So.3d at 1038.

While remoteness in time is one factor to be considered when determining whether the probative value of the evidence outweighs its prejudicial effect pursuant to La. C.E. art. 403, generally a lapse in time will go to the weight of the evidence, rather than to its admissibility. *Jones*, 346 So.3d at 347. Any inculpatory evidence, however, is "prejudicial" to a defendant, especially when it is "probative" to a high degree. *State v. Rodgers*, 16-14 (La. App. 5 Cir. 10/26/16), 202 So.3d 1189, 1201, *writs denied*, 16-2189 (La. 9/15/17), 225 So.3d 479 and 16-2093 (La. 1/29/18), 235 So.3d 1104. As used in the balancing test, prejudice limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. *Id*. The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged. *State v. Smith*, 19-607 (La. App. 5 Cir. 1/21/20), 2020 WL 356010, at *2, *writ denied*, 20-328 (La. 5/1/20), 295 So.3d 945.

The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. *State v. Miller*, 10-718 (La. App. 5 Cir. 12/28/11), 83 So.3d 178, 187, *writ denied*, 12-282 (La. 5/18/12), 89 So.3d 1191, *cert. denied*, 568 U.S. 1157, 133 S.Ct. 1238, 185 L.Ed.2d 177 (2013). Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence will not be disturbed. *State v. Le*, 13-314 (La. App. 5 Cir. 12/12/13), 131 So.3d 306, 317, *writ not considered*, *State ex rel. Le v. State*, 14-934 (La. 6/3/16), 192 So.3d 757.

On appeal, the defendant argues that the trial judge erred by allowing the admission of evidence that the defendant was physically abusive towards Nelin, Heidy, and their children. On November 26, 2018, the State filed a Notice of Intent to Introduce Evidence of Other Acts. The State sought to introduce evidence of domestic violence by the defendant and that he participated in drug,

gun, and human trafficking. On February 8, 2019, during a hearing on the State's notice, Nelin, B.M., J.M., M.C.M., and M.V.M. testified. In granting the State's motion, the trial judge stated, "Clearly, the facts that have been elicited through the witnesses in the areas of the abuse that they testified they suffered at the hands of the defendant clearly fits that exception and your motion will be granted as to that." The judge excluded evidence pertaining to trafficking in humans, weapons, and drugs.

At trial, Nelin testified that the defendant physically abused her, her sister, and their children. The defendant busted her lip, hit her, grabbed her by her hair, and grabbed her neck. He pointed a gun at her head, and he once fired shots toward her feet. B.M. testified that the defendant once beat Nelin with a plastic tube. Nelin testified that the defendant also hit Heidy in the head with a gun. M.C.M. testified that he saw the defendant hit his mother and threaten her with a gun. He also said that the defendant pointed a gun at Heidy's pregnant stomach and threatened to shoot her.

Nelin testified that defendant taped the children's mouths, hands, and feet and hung them by their legs. M.V.M. stated that on multiple occasions, defendant would tie the boys' feet and hang them upside down. B.M. indicated that defendant chained them and "pulled them like up, up their head, and like just grabbed them like that." Y.M. acknowledged that defendant would chain Y.M.'s legs, turn him upside down, and leave him. Y.M. testified that the defendant rarely hit B.M. or the girls but "mostly hit everybody else."

Our review of the record indicates that the trial court did not abuse its discretion in granting the State's Notice of Intent and admitting evidence regarding evidence of other acts of domestic abuse by the defendant. This evidence is admissible under the clear language of the exception set forth in La. C.E. art. 412.4. This evidence was admissible even though not all of the prior abuse

involved Heidy,[20] and the means of some of the prior abuse differed from the instant offense.[21] This evidence was independently relevant to show a pattern of domestic abuse toward members of the defendant's household, and demonstrated the defendant's volatile nature to the jury. Moreover, the record reflects that the trial judge gave a limiting instruction to the jury prior to its deliberations regarding the evidence. Thus, we find no error in the admission of the evidence of prior abuse of the victim and other family members by the defendant.

The admission of other crimes evidence is subject to harmless error analysis. *State v. Williams*, 05-318 (La. 1/17/06), 921 So.2d 1033, 1036, *writ denied sub nom. State ex rel. Williams v. State*, 06-973 (La. 11/3/06), 940 So.2d 654. An error is harmless when the verdict is "surely un-attributable to the error." *State v. Massey*, 11-358 (La. App. 5 Cir. 3/27/12), 97 So.3d 13, 29, *writ denied sub nom. State ex rel. Massey v. State*, 12-993 (La. 9/21/12), 98 So.3d 332.

A review of the record indicates that the State presented overwhelming evidence that the defendant committed the second degree murder of Heidy. The evidence proved that the defendant and Heidy were arguing in the bathroom immediately prior to her death. The children testified that the defendant became physically violent towards Heidy while the two were in the bathroom and that

---

[20] *See Jones*, 346 So.3d 339 (The defendant was charged with the second degree murder of his stepson and the attempted second degree murder of his step-grandson. This Court found that evidence of various prior incidents of domestic abuse against the defendant's wife and stepdaughter were admissible.). *See also Gatson*, 334 So.3d 1021 (This Court found evidence of prior threats to the victim and her cousin admissible.); *State v. Simmons*, 21-547 (La. App. 4 Cir. 11/24/21), 332 So.3d 158, *writ denied*, 22-112 (La. 3/15/22), 334 So.3d 397 (The charged offenses related to a former dating partner and the prior offense related to a different former dating partner).

[21] *See State v. Mitchell*, 18-326 (La. App. 5 Cir. 12/27/18), 263 So.3d 967 (The defendant shot and killed his ex-wife. The admitted other crimes evidence involved various physical altercations and threats, as well as one incident where the defendant punctured the victim's tires.); *Ard*, 347 So.3d 1046 (The charged incident involved domestic abuse battery by strangulation, and the prior incident involved domestic abuse against the same victim wherein the defendant broke the victim's front door and an interior door after an argument.). *See also State v. Piper*, 18-1796 (La. App. 1 Cir. 9/27/19), 287 So.3d 13 (The charged incident involved the defendant entering a former girlfriend's apartment, holding her under water in a bathtub, and choking her. Four prior incidents involving the same victim were admitted. The prior incidents involved domestic abuse battery by strangulation, domestic abuse battery, the defendant forcefully pulling the victim outside her apartment and attempting to get her to leave the complex with him, and him physically attacking her.); *State v. Porter*, 19-221 (La. App. 3 Cir. 8/14/19), 279 So.3d 1010 (The defendant stabbed his wife to death. The appellate court found several prior incidents admissible. During one incident, the defendant pushed the victim into a dresser. In another, the defendant physically attacked her, leaving marks on her neck. The final prior incident involved another attack wherein the victim sustained bruises around her neck, marks on her legs, feet, and toes, and a cut on her toe.).

22-KA-390                                              22

Heidy remained in the bathroom when the defendant left the bathroom. The autopsy showed that Heidy died from blunt force trauma to the back of her head. Blood splatters were consistent with the victim being struck on the back of the head with a blunt object while she was in the bathtub. A piece of rebar containing Heidy's DNA on one end and the defendant's DNA on the other end was located in the bathroom. Thus, the admission of the evidence of other acts of physical abuse was surely un-attributable to the verdict and any error in the admission of this evidence was harmless. Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER TWO

The defense's motion for mistrial should have been granted.

## DISCUSSION

The defendant argues that a mistrial should have been granted based on the prosecutors' improper behavior during closing argument and rebuttal closing argument. He argues that during closing argument, the prosecutor was attempting, by his posture, pointing, and his location next to the defense table, to antagonize the defendant. In rebuttal closing argument, the defense moved for a mistrial when the second prosecutor addressed the defendant directly, and then began crying during her argument. The trial judge sustained the defendant's objections to the prosecutors' conduct and admonished the jury, but the defendant contends that despite the admonishment to the jury to disregard the prosecutors' behavior, the remarks could not be unheard. The defendant concludes that the prosecutors' conduct was prejudicial and intentional, and the trial judge erred in denying his motion for mistrial.

The State responds that neither prosecutor behaved improperly during closing arguments and that they moved on when instructed by the trial judge to do so. The State points out that the jury was admonished to disregard the prosecutor's display of emotion. The State concludes that defendant has not shown that he was entitled to a mistrial or that the trial court abused its discretion.

During prosecutor Zach Popovich's closing argument, the defense counsel objected and said, "That's enough. I don't need him coming over." He stated the prosecutor could stay in his area. The judge called them up for a bench conference and told Mr. Popovich to "act accordingly." The defense counsel explained that this was the third time the prosecutor antagonized defendant, arguing: "He's doing it on purpose. He's doing it to rile up the jury and he's standing in front of my client, our client, and he's pointing at him and he's about four or five feet away and he's pointing at him. He can do it from the podium." Mr. Popovich stated that he understood and that he would not walk over there again. He resumed his closing argument without further objection.

After defense counsel's closing argument, prosecutor Kellie Rish presented rebuttal closing argument. She stated, "Pedro Alberto Monterroso Navas or Wilson Rigoberto Mena or Marlin Jovani Varela Mena or Carlos Humberto Cisneros Avila, whoever you are, Nelin was not yours to control and Heidy was not yours to control. Those beautiful children that those two women gave you were not yours to beat." The defense counsel then objected to her "addressing" the defendant and stated it was improper argument. Ms. Rish asserted that she was not going close to the defendant, and the judge instructed her to move on. While continuing her closing argument, the transcript reflects that she appears to interrupt herself to apologize and said she had the case for a long time, apparently because she became emotional. Ms. Rish then concluded her closing rebuttal argument. At a bench conference before the jury instructions, defense counsel stated that he wanted it on the record that both of the prosecutors addressed the defendant. He stated that Mr. Popovich, on at least three occasions, stood in front of defendant and pointed at him. Counsel argued that this was improper argument and was intended to inflame the jury. Counsel stated, "And then Ms. Rish, who was doing great, at the very end decides that she's going to do it. So both prosecutors did it, and then Ms. Rish starts crying in front of the jury." He argued that this conduct

was an effort to prejudice the jury in this highly emotional domestic case. Defense counsel then moved for a mistrial.

Ms. Rish replied that she did not think anything was done inappropriately and that the issue of getting too close to defendant was addressed when it was first raised. She argued that neither she nor Mr. Popovich got close to him after that. Ms. Rish explained, "It was not my intention to begin crying, and I explained and said that I was sorry and that's all I can say about that." She averred that it was not prejudicial.

The judge then denied the motion for a mistrial and stated he would instruct the jury to disregard addressing defendant and to "disregard other emotional situations." He noted the defense's objection.

At the beginning of the jury instructions, the judge stated: "I'm going to give you an instruction to disregard what happened as it related to addressing the defendant and the emotions that might have been displayed. Okay. So that's the Court's instruction on that. Please disregard that." The judge later instructed the jurors not to be influenced by mere sympathy, passion, prejudice, or public opinion. He also explained that the closing arguments are not to be considered as evidence.

On appeal, the defendant urges three grounds for a mistrial: the prosecutors addressing and approaching defendant, the prosecutor using his aliases, and the prosecutor crying.

First, the record indicates that the defense did not object to the use of the defendant's aliases when objecting to the prosecutors "addressing" the defendant. Pursuant to La. C.Cr.P. art. 841(A) an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. Thus, in order to seek appellate review of an alleged trial court error, a party must make a contemporaneous objection at trial, and he must state the grounds for the objection. *Williams*, 308 So.3d at 838. In the absence of a contemporaneous objection to the

use of the defendant's aliases by the prosecutor during closing argument, the issue of whether a mistrial should have been declared on the basis of improper use of the aliases has not been preserved for appellate review.

The issues of whether the trial judge erred in failing to grant a mistrial on the basis of the prosecutors approaching and pointing at the defendant and to Ms. Rish crying during closing argument were preserved for appellate review. La. C.Cr.P. arts. 770 and 771 govern improper comments made during closing arguments and authorize the trial court to correct a prosecutor's prejudicial remarks by ordering a mistrial or admonishing the jury at the defendant's request. *State v. Castillo*, 13-552 (La. App. 5 Cir. 10/29/14), 167 So.3d 624, 642, *writ denied sub nom. State ex rel. Castillo v. State*, 14-587 (La. 11/7/14), 152 So.3d 172, and *writ denied*, 14-2567 (La. 9/18/15), 178 So.3d 145. A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to the defendant that deprives him of a reasonable expectation of a fair trial. *State v. Williams*, 14-40 (La. App. 5 Cir. 9/24/14), 151 So.3d 79, 83, *writ denied*, 14-2250 (La. 6/19/15), 172 So.3d 649.

Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771. La. C.Cr.P. art. 775. The granting of a mistrial is within the discretion of the trial court if the trial court is satisfied that an admonition is not sufficient to assure the defendant a fair trial. *State v. Williams*, 04-1309 (La. App. 5 Cir. 4/26/05), 902 So.2d 485, 496, *writs denied*, 05-1640 (La. 2/3/06), 922 So.2d 1173, and 05-1640 (La. 2/3/06), 924 So.2d 144.

La. C.Cr.P. art. 774 provides:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
>
> The argument shall not appeal to prejudice.

> The state's rebuttal shall be confined to answering the argument of the defendant.

A prosecutor has considerable latitude in making closing arguments. *State v. Williams*, 03-942 (La. App. 5 Cir. 1/27/04), 866 So.2d 1003, 1014, *writ denied*, 04-450 (La. 6/25/04), 876 So.2d 832. A conviction will not be reversed due to improper remarks during closing argument unless the reviewing court is thoroughly convinced that the remarks influenced the jury and contributed to the verdict. *State v. Harris*, 17-78 (La. App. 5 Cir. 10/25/17), 230 So.3d 285, 298, *writ denied*, 17-1968 (La. 6/15/18), 257 So.3d 680.

Courts have traditionally upheld the denial of a motion for mistrial based on emotional outbursts when a defendant fails to show their influence upon the jury prejudiced his right to a fair trial. *State v. Licona*, 13-543 (La. App. 5 Cir. 5/21/14), 141 So.3d 333, 342, *writ denied*, 14-1806 (La. 4/2/15), 163 So.3d 791. The Louisiana Supreme Court has explained that courts "must credit the jurors with the good sense and fair-mindedness to see these outbursts for what they [are], the natural and irrelevant expression of human emotion, and not let the outbursts influence their decision." *Id*. (quoting *State v. Wessinger*, 98-1234 (La. 5/28/99), 736 So.2d 162).

In *State v. Richthofen*, 01-500 (La. App. 5 Cir. 11/27/01), 803 So.2d 171, the defendant argued that in the State's rebuttal closing argument, the prosecutor became emotional and cried, which prejudiced the defendant and caused the jury to identify with the prosecutor and side with his version of the case. The defendant contended that the trial court should have either admonished the jury after the display of emotion or granted a mistrial. This Court stated that the defense did not object during trial but that the issue was raised in a motion for new trial. In the trial judge's reasons for denying the motion for new trial, the judge provided that he did not feel that there was any attempt by the prosecutor to purposely express that emotion. The judge explained that the jury was instructed to base their verdict

on the facts and the evidence rather than prejudice, sympathy, or public opinion. This Court noted that the judge took a lengthy recess to allow everyone to regain their composure and instructed the jury not to base their verdict on prejudice, passion, sympathy, or public opinion. This Court explained that a mistrial was not requested at the time. This Court concluded that even if this assignment of error was viewed as a complaint regarding the trial court's denial of a new trial, there was no reversible error presented. *Id.*

The record does not reflect any additional emotional displays during closing and rebuttal closing argument by either prosecutor. The record clearly indicates that the judge instructed the jury to disregard "what happened as it related to addressing the defendant and the emotions that might have been displayed." The jury was instructed not to be influenced by mere sympathy, passion, prejudice, or public opinion and that closing arguments are not evidence. Given the overwhelming evidence of the defendant's guilt, the defendant has not demonstrated how the prosecutors' behavior during closing arguments could have prejudiced him to such a degree that a mistrial was warranted. Accordingly, we find no abuse of discretion by the trial judge in denying the request for a mistrial. This assignment is without merit.

**ERROR PATENT DISCUSSION**

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920;[22] *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

First we note an error in the State of Louisiana Uniform Commitment Order (UCO). While the UCO reflects that the defendant's sentence "shall be concurrent with any or every sentence the offender is now serving," neither the transcript nor the sentencing minute entry indicate that the trial court ordered the defendant's

---

[22] La. C.Cr.P. art. 920(2) states that an error patent is "[a]n error that is discoverable by an inspection of the pleadings and proceedings and without inspection of the evidence."

22-KA-390                                                    28

sentence to run concurrently with any other sentence he is serving. Therefore, this matter is remanded for correction of the UCO to delete the provision relating to the concurrent nature of the defendant's sentence. The Clerk of Court is ordered to transmit the original of the corrected UCO to the officer in charge of the institution to which the defendant has been sentenced and to the Department of Corrections' Legal Department. *See State v. Burnham*, 16-468 (La. App. 5 Cir. 2/8/17), 213 So.3d 470, 477, *writ denied*, 17-664 (La. 4/6/18), 240 So.3d 184 (where this Court remanded the matter for correction of the UCO when it stated the sentence was "concurrent with any or every sentence the offender is now serving" but the transcript and sentencing minute entry did not reflect this).

Additionally, there is a discrepancy between the transcript and the sentencing minute entry. Although the minute entry reflects that the defendant was properly advised of the time period for seeking post-conviction relief pursuant to La. C.Cr.P. art. 930.8, the transcript does not show an advisal as to post-conviction relief. Where there is a discrepancy between the transcript and the minute entry, the transcript generally prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

If a trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. *State v. Becnel*, 18-549 (La. App. 5 Cir. 2/6/19), 265 So.3d 1017, 1022. Accordingly, by way of this opinion the defendant is advised that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

## CONCLUSION

For the foregoing reasons, defendant's conviction of second degree murder and life sentence are affirmed.  This matter is remanded to the trial court for the limited purpose of correcting the UCO as directed above.

**CONVICTION AND SENTENCE AFFIRMED;
MATTER REMANDED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **APRIL 26, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 22-KA-390

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE DONALD L. FORET (DISTRICT JUDGE)
HOLLI A. HERRLE-CASTILLO          DARREN A. ALLEMAND (APPELLEE)          THOMAS J. BUTLER (APPELLEE)
(APPELLANT)

### MAILED
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
KELLIE M. RISH (APPELLEE)
ZACHARY P. POPOVICH (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053